# United States Tax Court

T.C. Memo. 2026-53

ALBERT S.N. HEE AND WENDY R. HEE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

WAIMANA ENTERPRISES, INC.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket Nos. 24068-22, 24077-22.                    Filed June 23, 2026.

————————

Albert S.N. Hee and Wendy R. Hee, pro se in Docket No. 24068-22.

*Howard T. Chang* and *Kurt K. Kawafuchi*, for petitioner in Docket No. 24077-22.

*Scott W. Forbord, Erika R. Sams, D. Anthony Abernathy, Yvonne M. Walker, Erik M. Martes*, and *Erick J. Quezada*, for respondent in Docket No. 24068-22.

*Adam R. Becker, Scott W. Forbord, Erika R. Sams, D. Anthony Abernathy, Yvonne M. Walker*, and *Erik M. Martes*, for respondent in Docket No. 24077-22.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

WEILER, *Judge*: These cases were consolidated for trial, briefing, and opinion. In Docket No. 24068-22 the Internal Revenue Service (IRS or respondent) determined deficiencies and section 6663[1] civil fraud penalties[2] for tax years 2004 through 2012 for petitioners Albert S.N. Hee and Wendy R. Hee (collectively, Hees) as follows:

| Year | Deficiency | I.R.C. § 6663 |
|------|-----------|---------------|
| 2004 | $4,664 | $3,498 |
| 2005 | 9,064 | 6,798 |
| 2006 | 28,900 | 21,675 |
| 2007 | 33,361 | 25,021 |
| 2008 | 64,389 | 48,292 |
| 2009 | 46,503 | 34,877 |
| 2010 | 87,636 | 65,727 |
| 2011 | 43,866 | 32,899 |
| 2012 | 22,800 | 17,100 |

In Docket No. 24077-22 respondent determined deficiencies and section 6663 civil fraud penalties for tax years 2003, 2004, and 2006 through 2008 and an addition to tax under section 6651(a)(1) for tax year 2003 for petitioner Waimana Enterprises, Inc. (Waimana), as follows:

| Year | Deficiency | Additions to Tax/Penalties | |
|------|-----------|---------------|------------------|
| | | I.R.C. § 6663 | I.R.C. § 6651(a)(1) |
| 2003 | $20,746 | $68,360 | $941 |
| 2004 | 58,208 | 43,656 | — |
| 2006 | 7,328 | 5,496 | — |
| 2007 | 54,343 | 40,757 | — |
| 2008 | 2,062 | 2,706 | — |

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[2] Respondent has determined that Mrs. Hee is not liable for section 6663 civil fraud penalties for any of the tax years at issue.

**[*3]**  The issues for decision are whether (1) the Hees failed to report constructive dividend income received by Mr. Hee for tax years 2004 through 2012 from Waimana; (2) Mr. Hee and Waimana fraudulently, and with the intent to evade tax, omitted income and/or overstated deductions from their respective tax returns for each tax year at issue; and (3) the statute of limitations bars assessment and collection of respondent's determined deficiencies.

## FINDINGS OF FACT

These cases were tried during a special trial session of this Court in Honolulu, Hawaii. Some of the facts are stipulated and are so found. The Stipulations of Facts and the attached Exhibits are incorporated herein by this reference. The Hees resided in Hawaii and Waimana's principal place of business was also in Hawaii when the Petitions in these cases were filed.

I.  *Background on Petitioners and Expenses Questioned by the IRS*

Mr. Hee, a native of Hawaii, attended Kamehameha Schools and graduated from the U.S. Naval Academy. Mr. Hee is married to Mrs. Hee, and they have three children: Adrianne, Breanne, and Charlton (collectively, Children).

Mr. Hee incorporated Waimana in 1988 and was its sole shareholder and president during tax years 2003 through 2012 (tax years at issue). Waimana was a C corporation, and its primary business was as a holding company for its affiliates. Waimana pursued new business opportunities, provided management services, and supported each of its affiliates' businesses.

Sandwich Isles Communications, Inc. (Sandwich Isles), was a C corporation and a wholly owned subsidiary of Waimana during the tax years at issue. The chief executive officer of Sandwich Isles for the tax years at issue was Robert Kihune. Sandwich Isles' primary business was to develop and provide telecommunication services on Hawaiian home lands for the State of Hawaii, Department of Hawaiian Home Lands.

Clearcom, Inc. (Clearcom), was a C corporation and a wholly owned subsidiary of Waimana during the tax years at issue. Clearcom's primary business was as a contractor to build and repair telecommunication networks and to provide data services. Clearcom was the general contractor for the Paniolo Cable, which is a Hawaiian

[*4] interisland cable. The Paniolo Cable is owned by Blue Ivory, LLC, which is owned by Mr. Hee's Children's three irrevocable trusts.

Ho'opa'a Insurance Co. (Ho'opa'a) was a C corporation and a wholly owned subsidiary of Waimana during the tax years at issue. Ho'opa'a's primary business was as a captive insurance company. Mr. Hee was president of Sandwich Isles, Clearcom, and Ho'opa'a (collectively, Subsidiaries).

To pay expenses Mr. Hee routinely used his personal credit cards: an American Express Centurion card, a Navy Federal Credit Union card, and an American Express Optima Platinum card (collectively, Credit Cards). Mr. Hee personally paid the balances of the Credit Cards each month, then sought reimbursement of certain expenses related to the appropriate business, namely Waimana, Sandwich Isles, or Clearcom.

On the Credit Cards' itemized monthly statements Mr. Hee would direct his assistant, Nancy Henderson, to categorize charges as personal or business related, record the general category of the charges (e.g., travel, meals/entertainment, or office expense), and allocate the charges to the Subsidiaries. Ms. Henderson would then prepare a "request for reimbursement" form and a reimbursement check. Mr. Hee would then approve the request for reimbursement by initialing the form and later signing his reimbursement check as Waimana's president.

Waimana and the Subsidiaries routinely reimbursed employees for company travel. The travel reservations for items such as rental cars, hotels, and other travel expenses would have to go through the travel coordinator, Joycelynn Costa. The travel reimbursement process required filling out a form, providing a receipt, stating the purpose of the travel, and identifying what parts of the travel were personal versus business. The form was then sent through a two-step approval process: (1) the travel coordinator would review the purpose of the travel and identify who was traveling and (2) management would approve the request. Trips taken by Mr. Hee and his family, however, were not reviewed by Ms. Costa through the ordinary process.

In addition to a travel reimbursement process there was a general reimbursement policy for Waimana and the Subsidiaries. Most of the expenses were funded and deducted by Sandwich Isles and Clearcom. The expenses were initially paid by Mr. Hee's Credit Cards, and then Sandwich Isles or Clearcom would deduct the expenses and repay the

[*5] amounts to Waimana. Waimana would then reimburse Mr. Hee for the total amount of business expenses.

The accounting firm of Chinaka & Siu and its certified public accountant (CPA) partners—Carlton Siu and David Chinaka—prepared Forms 1120, U.S. Corporation Income Tax Return, for Waimana for tax years 2003 through 2008. For tax years 2003 through 2008 Waimana did not file consolidated returns with the Subsidiaries. Therefore, for tax years 2003 through 2008 the expenses at issue which were funded and reimbursed by Sandwich Isles and Clearcom were not deducted on a consolidated basis with Waimana.

Waimana provided Chinaka & Siu's accountant Lynn Tamanaha with check registers containing the dates of the checks, the check numbers, the amounts of the checks, the payees, and the expense classifications. It would also provide the Credit Card statements to Chinaka & Siu at the end of the year. Chinaka & Siu relied upon the check registers' account classifications for preparing the tax returns. In the later years Waimana used QuickBooks to categorize checks and expense classifications which were furnished to Chinaka & Siu to prepare Waimana's tax returns.

Waimana requested an extension for tax year 2003 on October 15, 2004, but the return was not filed until April 23, 2007. The Form 1120 for tax year 2007 was also untimely filed on May 12, 2009. Waimana timely filed its Forms 1120 for tax years 2004 through 2006 and 2008.

In addition to preparing returns Chinaka & Siu provided other accounting services, including payroll, bookkeeping, and preparing calculations and trial balances. In preparation of Waimana's employment tax returns Chinaka & Siu received the hours worked for hourly employees, and for salaried employees Waimana would provide annual salaries as well as start and termination dates of employment. The payroll information received from Waimana was then entered into Chinaka & Siu's payroll tax software and used to prepare the necessary employment returns. Chinaka & Siu prepared Waimana's general ledger for tax year 2004.

Chinaka & Siu was also responsible for certified audits of Waimana's financial statements for tax years 2005 through 2007. Each certified audit was on a test basis which required review of supporting documentation, including invoices, canceled checks, receipts, deposits, loan documents, and leases. Since Chinaka & Siu both conducted the

[*6] certified audits and prepared the tax returns, the accountants would communicate with each other if something came up in the audits. At the end of each certified audit, Chinaka & Siu would prepare an independent auditor's report which would certify that the financial statements of that year conformed with U.S. generally accepted accounting principles. Since Sandwich Isles dealt with federal funding, it was heavily regulated by government regulators and likewise audited by a CPA firm in Portland, Oregon, specializing in these types of audits.

KMH, LLP (KMH), was engaged to prepare Forms 1120 for tax years 2009 through 2012. These tax returns were filed for Waimana on a consolidated basis with those of its Subsidiaries.

In preparing tax returns KMH used Prepared by Client requests to obtain information from Waimana. KMH prepared workpapers based on the information provided by Waimana and then input the approved workpapers into the tax software. In addition to preparing returns Waimana engaged KMH to assist in the IRS audit, which included receiving documents from Waimana and forwarding the documents to the IRS.

Chinaka & Siu—specifically Staff Accountant Lynn Yasaka—prepared the individual tax returns for the Hees and the Children for tax years 2004 through 2012. The Hees were responsible for furnishing all information required to complete the individual returns. When Chinaka & Siu received information from the Hees, it was placed in an organizer and then entered into the tax software where the Hees were responsible for reviewing the returns.

Mr. Hee reported receiving $150,009 in compensation from Waimana for 2004, $250,000 for 2005, $150,000 for each of the years 2006 through 2008, $606,250 for 2009, $450,000 for 2010, and $300,000 for each of 2011 and 2012.

A.    *Massages*

Mr. Hee suffers from chronic asthma, and upon graduation from the U.S. Naval Academy he was designated as not physically qualified for sea duty on the basis of his medical condition. Mr. Hee was under the care of Lindsey Kimura, a licensed chiropractor. As part of the treatment of his chronic asthma, Dr. Kimura prescribed massage therapy for Mr. Hee.

**[\*7]** Diane Doll was a massage therapist who provided massage therapy to Mr. Hee approximately twice a week beginning in 2002. The sessions took place at Ms. Doll's office at Kaka Professional Center and were approximately two hours long. Waimana paid Ms. Doll for Mr. Hee's therapy sessions by check, with annual fees ranging from $6,000 to $10,000. At the direction of Mr. Hee, Ms. Henderson first classified payments made by Waimana to Ms. Doll on the check memo lines as "professional services" and "services rendered." Beginning in 2006 Waimana recorded these payments to Ms. Doll on the general ledger as "consulting fees." The annual amounts paid to Ms. Doll for tax years 2003 through 2012 are approximately $6,000, $10,000, $8,000, $10,000, $10,000, $10,000, $8,000, $10,000, $8,000, and $8,000.

### B.     *Tuition*

The Hees' eldest daughter, Adrianne, attended Massachusetts Institute of Technology (MIT) from 2004 to 2009. On July 27, 2004, Waimana issued a $15,400 check payable to MIT for Adrianne's tuition. This check was recorded on Waimana's general ledger as an "educational expense." Later Waimana issued another check payable to MIT for $2,492 relating to Adrianne's dormitory at MIT. This check was recorded on Waimana's general ledger as a "travel expense." On September 20, 2004, Waimana issued another check payable to MIT for $225 relating to Adrianne's dining plan. This check was recorded on Waimana's general ledger as an "educational expense." On December 20, 2004, Waimana issued another check payable to MIT for $15,406 for Adrianne's tuition. This check was recorded on Waimana's general ledger as an "educational expense." Chinaka & Siu advised Waimana to reclassify the MIT expenses as loans to shareholders, and starting in 2005 the payments to MIT were recorded as loans to shareholders.

### C.     *Mr. Hee's Children's Salaries*

Beginning in 2003 Mr. Hee's Children were part-time employees of Waimana, but by 2006 many of the Children were receiving salaries. Mr. Hee's Children performed work over the summers and during holiday breaks, including photocopying documents, attending executive meetings, and working outside cutting grass or maintaining property owned by Waimana. When Mr. Hee's Children were full-time students, they did not have permanent office space in Waimana's buildings. The total amounts paid to Adrianne, Breanne, and Charlton for tax years 2006 through 2012 are approximately as follows:

[*8]

| Year | Adrianne | Breanne | Charlton | Total |
|------|----------|---------|----------|-------|
| 2006 | $23,000 | $23,000 | — | **$46,000** |
| 2007 | 26,664 | 26,665 | — | **53,329** |
| 2008 | 28,267 | 28,842 | $25,910 | **83,019** |
| 2009 | 52,109 | 52,163 | 31,834 | **136,106** |
| 2010 | 57,502 | 57,238 | 36,698 | **151,438** |
| 2011 | 50,565 | 49,829 | 29,633 | **130,027** |
| 2012 | 49,384 | — | 32,855 | **82,239** |

### D.    *Mrs. Hee's Salary*

Mrs. Hee has an undergraduate degree from Wesleyan University and a graduate degree in regional planning from Harvard University. Waimana paid Mrs. Hee a salary starting in 2000. Her role at Waimana included reviewing and editing documents, conducting research, gathering documents, attending social events, occasional recruiting activities, and acting as a sounding board to Mr. Hee. She did not have an office at Waimana during the tax years at issue. The total amounts paid to Mrs. Hee for tax years 2003 through 2012 are approximately $33,589, $42,670, $64,643, $53,749, $58,757, $60,815, $67,061, $78,906, $65,750, and $64,261.

### E.    *Employee Benefits Provided to Mrs. Hee and to the Children*

From 2005 through 2011, excluding 2009, Waimana made annual retirement plan contributions of $7,500 to its profit-sharing plan on behalf of Mrs. Hee and the Children. Beginning in 2007 and through 2012, excluding 2009, Waimana made employer match contributions of varying amounts to its section 401(k) plan on behalf of Mrs. Hee and the Children. Waimana provided varying insurance coverage options from 2009 through 2012 on behalf of Mrs. Hee and the Children: long term care, DSIN-HDS, DSPS-HDS, HSIN-HMAA, HSPS-HMAA, and critical illness coverage. In addition to the employee benefits referenced above, Waimana paid and allocated through Sandwich Isles long-term disability and life insurance premiums from 2009 through 2012 on behalf of Mrs. Hee and the Children. In sum, the total amounts of employee benefits provided for tax years 2005 through 2012 are approximately:

[*9]

| Year | Retirement Plan Discretionary Contribution | Section 401(k) Employer Match | Waimana Insurance Coverage | Sandwich Isles Benefits | **Total** |
|------|------|------|------|------|------|
| 2005 | $7,500 | — | — | — | **$7,500** |
| 2006 | 22,500 | — | — | — | **22,500** |
| 2007 | 22,500 | $13,256 | — | — | **35,756** |
| 2008 | 30,000 | 16,559 | — | — | **46,559** |
| 2009 | — | — | $34,706 | $1,289 | **35,995** |
| 2010 | 30,000 | 26,875 | 42,911 | 1,285 | **101,070** |
| 2011 | 30,000 | 25,000 | 50,358 | 1,120 | **106,479** |
| 2012 | — | 19,245 | 28,398 | 897 | **48,539** |

F.  *Miscellaneous Expenses*

1.  *Travel*

a.  *Airfare*

Starting in 2007 Waimana deducted costs of multiple flights for Mr. Hee's Children.[3] The costs in dispute were deducted as travel expenses by Waimana,[4] but the individual charges were classified under a variety of labels, including Air Travel, Travel, Management/Ownership Training, Advisory Board Meeting, and generally WEI. There was no supporting documentation regarding the purpose of the flights for Mr. Hee's Children. The total amounts reported by Waimana for tax years 2007 through 2012 and the amounts respondent disputed are as follows:

| Year | Total Travel Expenses Reported | Amount Disputed by Respondent |
|------|------|------|
| 2007 | $2,809 | $2,007 |
| 2008 | 19,905 | 9,751 |
| 2009 | 19,612 | 7,156 |
| 2010 | 33,027 | 5,054 |
| 2011 | 25,996 | 6,416 |
| 2012 | 13,403 | 1,554 |

---

[3] The airfare discussed here was primarily for Mr. Hee's Children, but the flight destinations are unclear from the Credit Card statements.

[4] A flight in March 2008 for Adrianne was charged to Clearcom.

**[*10]**     b.     *2008 Trip to France and Switzerland*

In March 2008 Mrs. Hee, Breanne, and her then boyfriend, Jonathan Kahalewai (Jonathan),[5] who was not an employee of Waimana at the time, traveled to France and visited the Alcatel factory for one day. The purpose of the factory visit was to inspect an undersea fiber optic communications cable to ensure the cable was being manufactured to the correct specifications. This trip to France coincided with Breanne's spring break from college.

Later Mrs. Hee, Breanne, and Jonathan traveled to Switzerland for a ski trip where they stayed in a bed and breakfast, went skiing, and partook in recreational activities. Clearcom deducted the France trip costs for Mrs. Hee, Breanne, and Jonathan. Clearcom also deducted the travel costs for Mrs. Hee, Breanne, and Jonathan to travel to Switzerland. In total Clearcom deducted $21,872 for the Switzerland and France trip.

c.     *2009 Presidential Inauguration Trip*

In January 2009 Mrs. Hee, Breanne, Jonathan, and Adrianne traveled to Washington, D.C., to attend President Obama's Presidential Inauguration ceremonies, including the Hawaii Society's Inauguration Ball which Waimana sponsored. In Washington, D.C., Mrs. Hee met with Senator Daniel Ken Inouye, a then member of the Senate's Committee on Appropriations. Waimana deducted the total travel costs of $2,878 associated with the trip to Washington, D.C.

d.     *2010 Trip to Tahiti*

In July 2010 Mrs. Hee and the Children traveled to the Island of Tahiti, French Polynesia, for about a week. In Tahiti Mrs. Hee and the Children spent a day looking for an undersea cable landing zone and a day trying to get in contact with Honotua, the company that owned the undersea cable. Waimana did not get in contact or make arrangements with anyone from Honotua before the trip to Tahiti. The rest of the trip was spent on personal activities, including attending Heiva, a dance competition. Clearcom deducted $7,280 in total for Mrs. Hee and the Children for the Tahiti trip.

---

[5] Jonathan and Breanne were married on July 4, 2010.

**[\*11]**            e.        *2010 Trip to Disney World*

Later in July 2010 Breanne, Jonathan, Adrianne, and a family friend, Amy, traveled to Orlando, Florida, to visit Walt Disney World for a week. At the time neither Jonathan nor Amy was an employee of Waimana. Mr. Hee purchased the tickets to attend Walt Disney World, which were reimbursed by Waimana. The claimed purpose of the trip was to build rapport with the chairman of Raytheon by riding a ride that was sponsored by Raytheon. The attendees rode the ride once, visited other parks, and stayed in Animal Kingdom Lodge for a week. Originally, the charges regarding the Walt Disney World trip were classified as personal, but Mr. Hee had the charges reclassified as business. Waimana deducted $10,919 in total for the trip to Walt Disney World.

f.        *2011 Stay at Mauna Lani*

In June 2011 the Hees and the Children (collectively, Hee family) stayed at Mauna Lani—a resort in Kona, Hawaii. On the general ledger the trip was classified as "Travel" and "Stockholder's Meeting." At the time of the trip, Mr. Hee was the only shareholder of Waimana. The stated purpose of the trip was for Waimana's succession planning. The Hee family met with Janeen Olds at Mauna Lani to assist with the succession planning for Waimana. Ms. Olds was not a shareholder but the general counsel and the trustee of the Children's irrevocable trusts. Waimana deducted $16,515 in total for the trip to Mauna Lani.

2.        *Sport Coat*

Mr. Hee was invited to dinner with executives from Raytheon by his longtime college friend and business colleague, Torkel Patterson. Shortly before dinner Mr. Hee purchased a sport coat from Saks Fifth Avenue for $1,246 which he wore to the dinner. The cost of the sport coat was deducted by Waimana as an office expense at the direction of Mr. Hee.

3.        *Meals and Entertainment*

Waimana deducted costs of various meals for the Hee family from 2009 through 2012. The costs were deducted as business meals and entertainment expenses by Waimana and Sandwich Isles, and the charges were further classified under a variety of business purposes including Abandoned Water Mains, Ownership/Management Training, Public Safety, Telecom, NOC Projects, Advisory Board, Landscaping,

[*12] Nursery and Abandoned Water Mines, and Stockholder's Meeting. These business charges, however, do not include documentation such as meeting agendas or notes, and many do not provide a receipt. The attendees at the meals ranged from the entire Hee family to one or two members. The total amounts reported by Waimana for tax years 2009 through 2012 and the amounts respondent disputed are as follows:

| Year | Total Meals and Entertainment Reported | Amount Disputed |
|---|---|---|
| 2009 | $8,696 | $2,401 |
| 2010 | 6,181 | 1,313 |
| 2011 | 4,990 | 1,964 |
| 2012 | 6,340 | 77 |

#### 4.    *Bookstore*

Waimana deducted a total of $1,106 from the Santa Clara University Bookstore in 2008 as an educational expense. There are no receipts for the charge.

#### 5.    *Office Expenses*

From 2007 through 2011 Waimana classified as office expenses various charges from Costco, Target, Santa Clara University Bookstore, Apple Store, a variety of clothing stores, and other household stores. There are no receipts provided for the purchases at these stores. For 2011 Waimana deducted $73 for airport parking and classified it as an auto expense for Stockholders Meeting. The total amounts reported by Waimana for tax years 2007 through 2011 and the amounts respondent disputed are as follows:

| Year | Total Office Expenses Reported | Amount Disputed |
|---|---|---|
| 2007 | $119,612 | $3,936 |
| 2008 | 164,409 | 7,400 |
| 2009 | 96,686 | 4,691 |
| 2010 | 57,780 | 3,343 |
| 2011 | 43,064 | 1,023 |

**[\*13]** G.   *Santa Clara House*

Waimana purchased a residence at 386 Monroe Street, Santa Clara, California (Santa Clara Property), for $1,249,608 on May 28, 2008. Waimana owned the Santa Clara Property from 2008 to 2022. The property had five bedrooms and an accessory dwelling unit with one bedroom.

Mr. Hee had a business interest in a biotech company named Siometrix, headquartered in Menlo Park, California. Mr. Hee stated that the reason for purchasing the Santa Clara Property was to provide a place to stay when visiting Siometrix to check on his investment.

However, in 2008 two of Mr. Hee's Children, Breanne and Charlton, attended Santa Clara University, which was within walking distance of the Santa Clara Property. Between 2008 and 2012 Breanne and Charlton resided in the Santa Clara Property and did not pay rent. They also rented the remaining open rooms to other tenants and collected rent. Rent collected was not remitted to Waimana; however, Breanne used the collected rent to pay maintenance expenses of the Santa Clara Property. Waimana did not report any rental income for tax years 2008 through 2010, but it did report rental income for tax years 2011 and 2012 of approximately $39,550 and $29,750.

Respondent offered former IRS employee Paul Walker as an expert witness to determine the average monthly fair market rent for the Santa Clara Property. Mr. Walker holds bachelor's and master's degrees from the University of Wisconsin, Madison. He is a California Certified General Real Estate Appraiser and a California Broker, and he holds an AI-GRS from the Appraisal Institute. Mr. Walker was accepted by the Court as an expert in the field of residential rental real estate appraisal.

Mr. Walker opined at trial that the average monthly fair market rent for the Santa Clara Property was $4,900 for 2008 through 2010 ($3,600 for the main structure and $1,300 for the accessory dwelling unit). He further opined that the average monthly fair market rent was $5,400 for 2011 ($3,900 for the main structure and $1,500 for the accessory dwelling unit) and $5,800 for 2012 ($4,200 for the main structure and $1,600 for the accessory dwelling unit).

**[\*14]** H.  *Cash Withdrawals*

Mr. Hee withdrew cash from ATMs using his Amex Optima card and submitted reimbursement requests to Waimana for the withdrawals. The reimbursement forms never specified what was purchased with the cash or whether the entire cash withdrawal was spent. The total annual amounts of cash withdrawals for 2007 through 2012, excluding 2008, that Mr. Hee was reimbursed for and Waimana deducted, were $8,733, $9,336, $5,423, $2,512, and $706, respectively.

I.  *Shareholder Loans*

Waimana classified certain payments on behalf of Mr. Hee as shareholder loans. On the basis of advice received from Chinaka & Siu Waimana adjusted educational expenses relating to tuition for MIT as loans to shareholders. Other educational expenses regarding tuition for Mr. Hee's Children included payments to Santa Clara University, Arizona State University, and Rhode Island School of Design, which were all classified as loans to shareholders. Expenses related to housing for Mr. Hee's Children incurred from 2005 through 2012 were classified as loans to shareholders to Mr. Hee. Other expenses classified as loans to shareholders included VISA credit card reimbursements, personal legal fees, costs for the Santa Clara Property, Life Insurance Premium, and the Buick Enclave.[6] Waimana's shareholder loans to Mr. Hee disputed by respondent are as follows:

| Year | Loan to Shareholder Account |
|------|-----------------------------|
| 2005 | $63,898 |
| 2006 | 83,419 |
| 2007 | 72,471 |
| 2008 | 158,143[7] |
| 2009 | 101,904 |
| 2010 | 299,142 |
| 2012 | 37,125 |

---

[6] Waimana purchased the Buick Enclave on August 4, 2008, in Santa Clara for Mr. Hee's use when he was in California. Breanne and Charlton had keys to the Buick Enclave and used it while attending Santa Clara University.

[7] Adjustments were made to the Loan to Shareholder account's total for tax year 2008 on the basis of an Adjusting Journal Entry for $38,893.

[*15] Waimana did not create promissory notes for the shareholder loans to Mr. Hee, nor did Mr. Hee furnish security for the shareholder loans. Mr. Siu advised Mr. Hee that it was good practice to have a promissory note that showed what was owed, how the loan would be repaid, and the interest rates. Waimana's general ledger recorded imputed interest income for the first time on December 31, 2012, and again on August 1, 2013.[8] Waimana made no steps to enforce repayment of the shareholder loans from 2005 through 2012, but Mr. Hee did make two separate repayments. The first was in 2011 for $298,856 and the second was in 2012 for $736,000.

This was not the first instance in which an employee had a loan from Waimana: Harold Johnston was an employee at Sandwich Isles, and part of his employment agreement provided that he would receive a $450,000 loan from Sandwich Isles. Both Mr. Hee and Mr. Johnston signed the employment agreement, and the loan was secured by a promissory note.

## II. *IRS Examination and Criminal Prosecution*

Beginning in 2008 the IRS selected petitioners' joint personal and corporate returns for examination. Initially, Chinaka & Siu represented Mr. Hee and Waimana in the audit. However, in 2009, because of a criminal referral by the IRS, Waimana retained KMH.

Mr. Hee testified in his criminal trial, *United States v. Hee*, No. 14CR00826-001, 2016 WL 337519 (D. Haw. Jan. 7, 2016), before Judge Susan Oki Mollway. Mr. Hee was found guilty by a jury of his peers on seven counts: One count of corrupt interference with the administration of Internal Revenue Laws under section 7212(a) and six counts of filing false tax returns for tax years 2007–12 under section 7206(1). *Hee*, 2016 WL 337519. Judge Mollway found that Mr. Hee's testimony was false, material, and willful, and she imposed a 46-month prison sentence and criminal monetary penalties, including a restitution order of $431,793 and a fine of $10,000. *Id.*

## III. *Notices of Deficiency*

Respondent issued a Notice of Deficiency dated August 5, 2022, to the Hees that was based on their Forms 1040, U.S. Individual Income Tax Return, with respect to deficiencies in income tax and penalties

---

[8] The imputed interest recorded on August 1, 2013, was for interest recorded on the loan for 2004 through 2011.

[*16] under section 6663 for tax years 2004 through 2012. Respondent determined that Mrs. Hee is not liable for the section 6663 penalties under section 6663(c).

Respondent issued a Notice of Deficiency dated August 5, 2022, to Waimana that was based on its Forms 1120 with respect to deficiencies in income tax and penalties under section 6663 for tax years 2003, 2004, and 2006 through 2008 and an addition to tax under section 6651(a)(1) for tax year 2003. Respondent determined the Hees received constructive dividends from Waimana for each year at issue on the basis of the disallowance of certain business deductions. In the alternative, respondent determined that the Hees received additional wages for services equal to the disallowance of certain business deductions claimed. In the Notice of Deficiency respondent disallowed a portion of the net operating loss (NOL) Waimana claimed for the tax years 2003 and 2004. Waimana's reported NOL deduction for year 2003 consisted of an NOL incurred in tax year 2005, and Waimana's reported NOL deduction for year 2004 consisted of NOLs incurred in tax years 2005 and 2006. Respondent's disallowed NOLs are attributable to Waimana's disallowed business deductions incurred in tax years 2005 and 2006.

IV.    *Trial Evidence*

Trial of these consolidated cases spanned some ten days with the parties presenting substantial testimony, deposition testimony, and documents as evidence. The Court heard from current and former employees and officers of Waimana and the Subsidiaries, the Hees, the Hee Children, and accountants and tax preparers from both Chinaka & Siu and KMH, among other witnesses. Petitioners called 9 witnesses and respondent called 16. At trial Mr. Hee represented himself and presented the Hees' portions of their case,[9] which allowed the Court to observe Mr. Hee for a substantial length of time.

Respondent primarily relies on a table produced by the Government in Mr. Hee's criminal trial, *see Hee*, 2016 WL 337519, which was introduced at trial in these cases as Exhibit 421-J. Respondent refers to Exhibit 421-J throughout his briefing to support nearly all of his calculations. This table was prepared by an IRS special agent and used to calculate the "tax loss" alleged by the Government against

---

[9] Petitioner Waimana was separately represented at trial by counsel.

[*17] Mr. Hee. The table breaks down the questioned expenses between Waimana and the Subsidiaries.[10]

OPINION

Petitioners argue that the periods of limitation have expired, and they dispute the applicability of the section 6663 fraud penalties.

Section 6501(a) provides, generally, that the amount of any tax must be assessed within three years of the filing of a return. The Notices of Deficiency in these cases were issued more than three years after the relevant returns were filed. Therefore, the periods of limitation for the tax years at issue have expired and assessment is barred unless an exception to the general period applies.

Section 6501(c)(1) provides that, where a taxpayer has filed "a false or fraudulent return with the intent to evade tax," there is no period of limitations, and the tax "may be assessed . . . at any time." "Fraud for this purpose is defined as intentional wrongdoing by the taxpayer with the specific purpose of avoiding tax believed to be owed." *Fabian v. Commissioner*, T.C. Memo. 2022-94, at *25. In the case of a joint return, fraud by either taxpayer suspends indefinitely the period of limitations for both taxpayers. *Vannaman v. Commissioner*, 54 T.C. 1011, 1018 (1970); *see Richardson v. Commissioner*, 509 F.3d 736, 745 (6th Cir. 2007) (holding that fraud by one spouse "lifts the statute of limitations" for both), *aff'g* T.C. Memo. 2006-69; *Ballard v. Commissioner*, 740 F.2d 659, 663 (8th Cir. 1984), *aff'g in part, rev'g in part* T.C. Memo. 1982-466. Accordingly, if we determine fraud as to Mr. Hee, the periods of limitation are suspended as to the Hees' joint returns. *See Vannaman*, 54 T.C. at 1018.

I.    *Burden of Proof*

The Commissioner's determinations in a Notice of Deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. Rule 142(a); *see Welch v. Helvering*, 290 U.S. 111, 115 (1933). When, as here, the case involves unreported income, the Commissioner must produce evidence linking the taxpayer to an income-producing activity; and once the Commissioner has met his

---

[10] Here, however, respondent attributes all the questioned expenses from Exhibit 421-J, including those of the Subsidiaries' expenses, to Waimana even though for tax years 2003 through 2008 Waimana did not file on a consolidated basis with its Subsidiaries. This discrepancy will be addressed under Rule 155.

**[\*18]** threshold burden, the burden shifts to the taxpayer to prove the determinations are arbitrary or erroneous. *Walquist v. Commissioner*, 152 T.C. 61, 67–68 (2019); *Estate of Clemons v. Commissioner*, T.C. Memo. 2022-95, at \*16.

In cases of section 6663 civil fraud penalties and proving fraud as an exception to the general period of limitation, the Commissioner bears the burden of proof by clear and convincing evidence. I.R.C. § 7454(a); Rule 142(b); *see Petzoldt v. Commissioner*, 92 T.C. 661, 699 (1989); *Browning v. Commissioner*, T.C. Memo. 2011-261, 102 T.C.M. (CCH) 460, 467.

The Commissioner must show by clear and convincing evidence that (1) an underpayment exists for each year and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. I.R.C. § 7454(a); Rule 142(b); *Parks v. Commissioner*, 94 T.C. 654, 660–61 (1990). Determining fraud as an exception to the general period of limitation is the same as his burden under section 6663 to prove applicability of the civil fraud penalty. *See Matthews v. Commissioner*, T.C. Memo. 2018-212, at \*21; *Browning*, 102 T.C.M. (CCH) at 467.

To determine whether respondent satisfies his burden, we must first determine whether an underpayment exists for each year.

II.   *Underpayments*

Before trial we granted respondent's Motion for Partial Summary Judgment and held, on the basis of Mr. Hee's prior criminal conviction, that the Hees had underpayments of tax and filed false tax returns for tax years 2007 through 2012. In addition, we are convinced that respondent has established by clear and convincing evidence that underpayments of tax as to Waimana existed for the tax years at issue and as to the Hees for 2004–06. The amounts of the deficiencies for the tax years at issue are further described below.

III.   *Amounts of the Deficiencies*

Petitioners contest the amounts of the deficiencies regarding the underpayments. Respondent contends that Mr. Hee received unreported income during tax years 2004 through 2012 in the form of constructive dividends from Waimana and that Waimana incorrectly deducted payments during tax years 2003, 2004, and 2006 through 2008, as follows:

**[\*19]**

| Year | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Massages* | $6,000 | $10,000 | $8,000 | $10,000 | $10,000 | $10,000 | $8,000 | $10,000 | $8,000 | $8,000 |
| *MIT Tuition* | — | 33,523 | — | — | — | — | — | — | — | — |
| *Salaries to Children* | — | — | — | 46,000 | 53,329 | 83,019 | 136,106 | 151,438 | 130,027 | 82,239 |
| *Salary to Mrs. Hee* | 33,589 | 42,670 | 64,643 | 53,749 | 58,757 | 60,815 | 67,061 | 78,906 | 65,750 | 64,261 |
| *Employee Benefits to Children and Mrs. Hee* | — | — | 7,500 | 22,500 | 35,756 | 46,559 | 35,995 | 101,070 | 106,479 | 48,539 |
| *Miscellaneous Expenses*[11] | — | — | — | — | 5,942 | 40,130 | 18,271 | 27,944 | 25,990 | 1,632 |
| *Santa Clara Property*[12] | — | — | — | — | — | 29,400 | 58,600 | 57,600 | 17,350 | 29,450 |
| *Cash Withdrawals* | — | — | — | — | 8,733 | — | 9,336 | 5,423 | 2,512 | 706 |
| *Loans to Shareholders* | — | — | 63,898 | 83,419 | 72,471 | 158,143 | 101,904 | 299,142 | — | 37,125 |
| *Total* | **$39,589** | **$86,193** | **$144,041** | **$215,668** | **$244,988** | **$428,066** | **$435,273** | **$731,523** | **$356,108** | **$271,952** |

---

[11] Miscellaneous expenses include the personal expenses reimbursed to Mr. Hee: travel, the sport coat, meals and entertainment, the Santa Clara University Bookstore purchases, and office expenses.

[12] The Santa Clara Property rent applies only to the Hees. Respondent's expert provided higher values regarding the fair market value of the Santa Clara Property than found in respondent's Notice of Deficiency for tax years 2009 through 2012; respondent, however, did not seek an increase to the deficiencies determined.

[*20] Except as otherwise provided in the Code, "gross income means all income from whatever source derived." I.R.C. § 61(a). Dividends may be formally declared or constructive. A constructive dividend is an economic benefit—without expectation of repayment—conferred upon a shareholder by a corporation. *Truesdell v. Commissioner*, 89 T.C. 1280, 1295 (1987) (citing *Noble v. Commissioner*, 368 F.2d 439, 443 (9th Cir. 1966), *aff'g* T.C. Memo. 1965-84). "The determination of constructive dividend income received by [the taxpayers] is a determination of unreported income." *Luczaj & Assocs. v. Commissioner*, T.C. Memo. 2017-42, at *20. The amount of the constructive dividend is equal to the fair market value of the benefit received. *See Challenge Mfg. Co. v. Commissioner*, 37 T.C. 650, 663 (1962).

Sections 301 and 316 determine the classification of corporate distributions of property to a shareholder. *Benavides & Co., P.C. v. Commissioner*, T.C. Memo. 2019-115, at *18–19. If the distributing corporation has sufficient earnings and profits (E&P), the distribution is a dividend that the shareholder must include in gross income. I.R.C. §§ 301(c)(1), 316; *Benavides & Co.*, T.C. Memo. 2019-115, at *18–19. If the distribution exceeds the corporation's E&P, the excess represents a nontaxable return of capital or capital gain. I.R.C. § 301(c); *Benavides & Co.*, T.C. Memo. 2019-115, at *18–19. The taxpayer bears the burden of proving that the corporation lacks sufficient E&P to support dividend treatment at the shareholder level. *Truesdell*, 89 T.C. at 1295–96; *Zalewski v. Commissioner*, T.C. Memo. 1988-340, 55 T.C.M. (CCH) 1430, 1435. If neither party presents evidence as to the distributing corporation's E&P, the taxpayer has not met his burden of proof. *Truesdell*, 89 T.C. at 1295–96; *Vlach v. Commissioner*, T.C. Memo. 2013-116, at *33 n.38.

Petitioners do not present evidence as to Waimana's and the Subsidiaries' accumulated E&P for the tax years at issue. *See Luczaj & Assocs.*, T.C. Memo. 2017-42, at *22–23. Respondent does present evidence as to Waimana's E&P after adjusting for the constructive dividend distributions, concluding that it had E&P of approximately $565,753, $576,959, $342,646, $494,746, $121,400, $110,025, $31,325,183, $34,687,701, $34,447,918, and $28,062,802 for the tax years at issue. Waimana made one cash distribution of $1 million to Mr. Hee as a shareholder in 2012, but Waimana did not report any distribution of cash, stock, or property from 2005 through 2011.

**[\*21]** Accordingly, both Waimana and the Subsidiaries had sufficient E&P in the tax years at issue to justify dividend treatment.[13]

"Corporate expenditures constitute constructive dividends only if 1) the expenditures do not give rise to a deduction on behalf of the corporation, and 2) the expenditures create 'economic gain, benefit, or income to the owner-taxpayer.'" *P.R. Farms, Inc. v. Commissioner*, 820 F.2d 1084, 1088 (9th Cir. 1987) (quoting *Meridian Wood Prods. Co. v. United States*, 725 F.2d 1183, 1191 (9th Cir. 1984)), *aff'g* T.C. Memo. 1984-549, 48 T.C.M. (CCH) 1379.

The Code allows deductions for all ordinary and necessary business expenses paid or incurred in carrying on a trade or business. I.R.C. § 162(a); *Boyd v. Commissioner*, 122 T.C. 305, 313 (2004). An "ordinary" expense is one that is common and acceptable in the particular business. *Welch v. Helvering*, 290 U.S. at 113–14. A "necessary" expense under section 162(a) is an expense that is appropriate and helpful in carrying on the trade or business. *Heineman v. Commissioner*, 82 T.C. 538, 543 (1984). No deduction is allowed for "personal, living, or family expenses." I.R.C. § 262(a).

"A taxpayer's general statement that expenses were paid in pursuit of a trade or business is insufficient to establish that the expenses had a reasonably direct relationship to any such trade or business." *Sham v. Commissioner*, T.C. Memo. 2020-119, at \*58. Taxpayers are required to keep adequate records to substantiate these deductions. *See* I.R.C. § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a). As a general rule, if a taxpayer provides sufficient evidence of having incurred a trade or business expense contemplated by section 162(a) but is unable to adequately substantiate the amount, the Court may estimate the amount and allow a deduction to that extent. *Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930). In order for the Court to estimate the amount of an expense there must be some basis upon which an estimate may be made. *Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985).

---

[13] Petitioners did not address whether the corporations had sufficient E&P for the Court to categorize the payments as dividends under section 316. *See, e.g.*, *Truesdell*, 89 T.C. at 1295–96 (holding that because neither party introduced evidence regarding E&P, taxpayer failed to meet his burden of proving that there were not sufficient E&P to support the deficiency determined in the Notice of Deficiency); *see also Luczaj & Assocs.*, T.C. Memo. 2017-42, at \*22–23.

**[\*22]** The remaining questions for finding constructive dividend treatment are whether the claimed expense deductions disallowed by the IRS are in fact deductible and whether Waimana's expenditures "represent[ed] some economic gain, benefit or income to the owner-taxpayer." *See Meridian Wood Prods.*, 725 F.2d at 1191.

A. *Massages*

Petitioners argue that the costs of Mr. Hee's massages are deductible. Petitioners contend that deductibility is not based on whether the massages are needed for Mr. Hee to perform his job, but on whether the massages are cheaper than finding a replacement worker. We do not agree with petitioners.

In *Hutchison v. Commissioner*, 13 B.T.A. 1187, 1190 (1928), the Court held that massages were ordinary and necessary business expenses since the taxpayer was in the business of "stunt" acting and needed massages to be in excellent physical condition. Here, Mr. Hee is in the business of telecommunications. Although the massages were part of a holistic approach that was successful in treating his asthma, they were not an ordinary and necessary business expense. The deduction is inherently personal and not ordinary and necessary in the telecommunications industry or appropriate for carrying on the business. *See Kelly v. Commissioner*, T.C. Memo. 1991-605, 62 T.C.M. (CCH) 1406, 1407 ("Because the cost of maintaining good health is one of those expenses which is so 'inherently personal' that it simply cannot qualify as a business expense within section 162, such cost is not deductible." (quoting *Fred W. Amend. Co. v. Commissioner*, 55 T.C. 320, 326 (1970), *aff'd*, 454 F.2d 399 (7th Cir. 1971))).

Therefore, under the first element of constructive dividends, the massage payments are not deductible under section 162 for the tax years at issue. *See supra* Table p. 19.

"Corporate payments to third parties may constitute constructive dividends if they are made on behalf of a shareholder or for his economic benefit." *Luczaj & Assocs.*, T.C. Memo. 2017-42, at \*22; *see United States v. Mews*, 923 F.2d 67, 68 (7th Cir. 1991). Here, Waimana paid Ms. Doll on behalf of Mr. Hee who was personally receiving the benefit of the massages. Accordingly, the massage payments from 2004 to 2012 are constructive dividends to the Hees.[14]

---

[14] Respondent has not asserted that the Hees have a deficiency for 2003.

[*23] B.    *MIT Tuition*

Educational expenses are ordinary and necessary expenses if the education "[m]aintains or improves skills required by the individual in his employment" or "[m]eets the express requirements of the individual's employer." Treas. Reg. § 1.162-5(a); *see Love Box Co. v. Commissioner*, 842 F.2d 1213, 1216–17 (10th Cir. 1988), *aff'g* T.C. Memo. 1985-13. "The taxpayer must show that the educational expense is directly and proximately related to the skills required in his trade or business." *O'Connor v. Commissioner*, T.C. Memo. 2015-155, at *5–6, *aff'd*, 653 F. App'x 633 (10th Cir. 2016). However, an educational expense is not deductible if it will lead to qualifying the taxpayer for a new trade or business. Treas. Reg. § 1.162-5(b)(3)(i).

At MIT Adrianne majored in architecture, which bears no relationship to the telecommunication work that Waimana performed. Waimana did not have a program for paying an employee's educational expenses as Judith Ushio, an employee of Waimana, testified that she does not know of anyone else who had educational expenses paid by Waimana or Sandwich Isles. After 2004, the MIT tuition payments were reclassified as shareholder loans to Mr. Hee. Accordingly, the MIT payments for tuition and living expenses of $33,523 are not deductible under section 162. The MIT tuition payments are an economic benefit to the Hees. *See Meridian Wood Prods.*, 725 F.2d at 1191. Thus, the payments are constructive dividends to the Hees.

C.    *Salaries and Employee Benefits to Children and Mrs. Hee*

Deductible business expenses include "a reasonable allowance for salaries or other compensation for personal services actually rendered." I.R.C. § 162(a)(1). Certain benefit plans, pension plans, profit-sharing plans, or other contribution plans may be included in compensation. *See* I.R.C. §§ 162(a)(1), 404(a); Treas. Reg. §§ 1.162-10(a), 1.404(a)-1(b). The test for determining the deductibility of compensation payments is whether (1) they are reasonable in amount and (2) they are in fact payments purely for services. Treas. Reg. § 1.162-7(a). "Moreover, where a family relationship is involved, the facts require close scrutiny to determine whether a bona fide employer-employee relationship existed and whether the payments received were made on account of the employer-employee relationship or the family relationship." *Haeder v. Commissioner*, T.C. Memo. 2001-7, 81 T.C.M. (CCH) 987, 995; *see Archer v. Commissioner*, T.C. Memo. 2018-111, at *9–10, *aff'd*, 821 F. App'x 865 (9th Cir. 2020); *Wycoff v. Commissioner*, T.C. Memo. 2017-203, at *44

**[\*24]** ("Special scrutiny is given in situations where a corporation is controlled by the employees to whom the compensation is paid because there is a lack of arm's-length bargaining.").

1. *The Children*

The Children received payments from Waimana beginning in 2005, but Adrianne and Breanne began receiving salaries in 2006 and Charlton in 2008. Petitioners argue that Mr. Siu advised Mr. Hee that he could pay his Children as long as they were working and that the payments to the Children were the lowest in Waimana. Petitioners offered testimony of Waimana employees that the Children would work during the summer and holiday breaks.

The Court has previously disallowed expenses for children's compensation when it was not persuaded the compensation was reasonable because the taxpayer "did not keep track of the hours her children worked or the services they performed." *Wax v. Commissioner*, T.C. Memo. 2018-63, at \*7. Waimana did not accurately document the type of work or hours performed per week by Adrianne in 2006, 2007, and 2009 through 2012. It seems unlikely that Adrianne worked a sufficient number of hours for Waimana to receive a reasonable salary since she was a full-time student from 2004 to 2009 at MIT, studied abroad for two summers, worked part-time jobs while attending MIT, and worked 40 hours a week at various other jobs after graduating in 2009.

Adrianne began courses at Rhode Island School of Design starting in August 2010, but from July 2010 through the end of June 2011 records indicate she worked 2,008 hours. Adrianne testified that she did not devote 2,008 hours of time to the company business during the calendar year. Gayle Honda from Waimana testified that the 2,008 hours are automatically input into the system for salaried employees to generate the pay. The evidence presented indicates Adrianne did not work the hours recorded. Thus, the salary payments and employee benefits Adrianne received are not reasonable compensation and are not deductible by Waimana.

Waimana compensated Breanne as a salaried employee starting in 2006. From 2006 to 2007 Waimana recorded Breanne's hours, but as with Adrianne, Waimana did not document the type of work Breanne performed; and from 2008 through 2011 Waimana did not document the hours Breanne worked. *See Francis v. Commissioner*, T.C. Memo.

[*25] 2007-33, 93 T.C.M. (CCH) 904, 906 (holding that a taxpayer is not entitled to a business expense deduction for an employee benefit plan when there was no documentation of hours or time the employee worked). We are not persuaded that Breanne's salary from Waimana starting in 2006 was reasonable since she attended Santa Clara University from 2005 to 2009 as a full-time student, worked part-time jobs throughout college, and after college worked various full-time jobs. Accordingly, the salary and employee benefits Breanne received cannot be determined to be reasonable compensation; therefore, Waimana cannot deduct the payments.

Charlton was a full-time student at Santa Clara University from 2008 to 2012. Charlton was paid a salary during his time at Santa Clara University. He testified that he was responsible for managing the Santa Clara Property, and he performed tasks including plumbing, roofing, fencing, lawn work, and general house maintenance. Charlton's testimony regarding his work was uncorroborated as Waimana recorded that Charlton worked 34–88 hours per pay period in 2008. But it is unclear whether these hours are entirely attributable to the housing maintenance given that Waimana does not document the type of work he performed. After graduation in 2012, Charlton returned to Hawaii and worked in the arts department at Kamehameha Schools, and he testified that he worked for Waimana only on the weekends and on the weekdays when he was not teaching at the school. We hold that petitioners have failed to prove that the payments to Charlton were reasonable. Thus, Waimana may not deduct the salary and employee benefits Charlton received.

Considering the foregoing, the salaries and employee benefits paid to the Children from 2006 to 2012 are not deductible. *See supra* Table p. 19.

"Transfer of income within the family presumably benefits both transferor and transferee." *P.R. Farms, Inc. v. Commissioner*, 820 F.2d at 1088. "The rule that a shareholder has received a constructive dividend by virtue of a corporation's expenditures for the benefit of a member of the shareholder's family results from the application of the assignment of income doctrine." *P.R. Farms*, 48 T.C.M. (CCH) at 1395; *see Green v. United States*, 460 F.2d 412, 419–21 (5th Cir. 1972); *Benson v. Commissioner*, T.C. Memo. 2004-272, 88 T.C.M. (CCH) 520, 540, *supplemented by* T.C. Memo. 2006-55, *aff'd*, 560 F.3d 1133 (9th Cir. 2009). The Court held in *P.R. Farms*, 48 T.C.M. (CCH) at 1395:

**[\*26]** We believe that [the father] initiated the arrangement in order to benefit his children, the owners of Palomate. . . . [W]e need not find that an actual distribution was made to [the father] in order to hold that he received a constructive dividend from the transaction. . . . Moreover, for the purpose of determining whether a constructive dividend occurred, we find that a significant benefit was conferred upon [the] children through Palomate's retention of the net proceeds. We therefore hold that the net proceeds retained by Palomate are taxable to [the father] as a constructive dividend.

A result similar to that in *P.R. Farms* is appropriate here. Waimana's transfers of employee benefits and salaries to Mr. Hee's Children are benefits to Mr. Hee as its sole shareholder and president. We do not need to find that an actual distribution was made to Mr. Hee to find that he received a benefit by transferring money to his Children. Accordingly, the salary and employee benefit payments to the Children from 2006 to 2012 are constructive dividends to the Hees.

### 2. *Mrs. Hee*

As with the payments to the Children, Waimana's salary and employee benefit payments to Mrs. Hee are not deductible. Mrs. Hee's role at Waimana is unclear as she testified that she occasionally reviewed and edited documents, acted as a sounding board to Mr. Hee, and attended business functions. However, she never had an office at Waimana, and her testimony was uncorroborated. Mrs. Hee also testified that she worked in recruiting because she assisted a new employee in finding a home in Hawaii. Yet petitioners do not provide any other examples or testimony to support their claim that Mrs. Hee worked in recruiting roles beyond this single event. And contrary to her testimony, Charlton testified that his mother stayed at home and took care of the family from 2001 to 2008.

Other than the foregoing self-serving testimony, petitioners did not provide evidence of the type of work Mrs. Hee performed for Waimana on a regular basis. As a result, the salary and employee benefit payments to Mrs. Hee are not deductible by Waimana. *See supra* Table p. 19. The salary payments are likewise an economic benefit to the Hees. *See Meridian Wood Prods.*, 725 F.2d at 1191. Thus, the payments for tax years 2004 through 2012 should be reclassified as constructive dividends to the Hees.

**[\*27]**  D.    *Miscellaneous Expenses*

A taxpayer may deduct reasonable and necessary travel expenses such as meals and lodging incurred while away from home in the pursuit of a trade or business. I.R.C. § 162(a)(2); *see Commissioner v. Flowers*, 326 U.S. 465, 470 (1946); *Langlois v. Commissioner*, T.C. Memo. 2025-12, at \*10. Certain expenses otherwise deductible under section 162(a) are subject to heightened substantiation requirements under section 274(d); these include expenses for traveling, auto expenses, and meals and entertainment. *See* I.R.C. § 274(d)(1) and (2); *Jaha v. Commissioner*, T.C. Memo. 2025-26, at \*13–14; Temp. Treas. Reg. § 1.274-5T(a). "A taxpayer generally must substantiate such expenses with adequate records, or by sufficient evidence corroborating the taxpayer's own statement, establishing (1) the amount of the expense; (2) the time and place it was incurred; and (3) its business purpose." *Jaha*, T.C. Memo. 2025-26, at \*14; *accord Balyan v. Commissioner*, T.C. Memo. 2017-140, at \*7; Temp. Treas. Reg. § 1.274-5T(b).

"Substantiation by adequate records requires the taxpayer to maintain (1) an account book, diary, log, statement of expense, trip sheets, or similar record prepared contemporaneously with the expenditure and (2) documentary evidence, such as receipts or paid bills, which together prove each element of an expenditure." *Balyan*, T.C. Memo. 2017-140, at \*8; Temp. Treas. Reg. § 1.274-5T(c)(2). The Court may not estimate expenses under *Cohan* in situations where section 274 requires specific substantiation. *See* I.R.C. § 274(d); *Sanford v. Commissioner*, 50 T.C. 823, 827–28 (1968), *aff'd per curiam*, 412 F.2d 201 (2d Cir. 1969); Temp. Treas. Reg. § 1.274-5T(a).

1.    *Travel*

a.    *Airfare*

In addition to satisfying section 162 the heightened substantiation requirements of section 274 must be met for airfare expenses. *See Edwards v. Commissioner*, T.C. Memo. 2014-57, at \*20. Here, Waimana deducted costs of multiple flights for the Children from their colleges back home to Hawaii at various times each year including around the holidays.[15] The individual flights were classified under a variety of titles including Air Travel, Travel, Management/Ownership

---

[15] In 2009 there was a round-trip flight for Adrianne around Thanksgiving, from Boston, Massachusetts, to Honolulu and back to Boston, where Adrianne was attending MIT.

[*28] Training, Advisory Board Meeting, and generally WEI, but there is no supporting documentation regarding the business purposes of the flights.

Waimana's only documentation is the Credit Card statements, which occasionally provide passenger information, date, price, or the origin and destination cities, but not all charge statements provide this information. *See id.* at *20–21 (holding that the taxpayers did not comply with section 274 when handwritten notes were not prepared contemporaneously with travel and "do not include pertinent information such as the date, the origin and destination cities, or the business purpose of the travel"). The lack of substantiation for the deducted airfare does not satisfy the heightened standard of section 274. *See Ismail v. Commissioner*, T.C. Memo. 2022-113, at *13–14. Therefore, the airfare expenses from 2007 to 2012 are not deductible by Waimana. The airfare payments by Waimana for the Children are also an economic benefit to the Hees. *See Meridian Wood Prods.*, 725 F.2d at 1191. Accordingly, the airfare payments made from 2007 to 2012 are constructive dividends to the Hees. *See supra* Tables pp. 9, 19.

b. *2008 Trip to France and Switzerland*

Clearcom deducted the costs for the 2008 trip to France and Switzerland.[16] Mr. Hee acknowledged that the deduction of the Switzerland portion of the trip was a mistake. Therefore, expenses of the Switzerland portion of the trip are not deductible under section 162.

Petitioners fail to present evidence of a business purpose for the trip to France. Petitioners argue that the purpose was to visit the Alcatel factory to observe the undersea cable being manufactured. Mr. Hee and other Waimana employees testified that they were too busy to visit the location, which is why Mrs. Hee, Breanne, and Jonathan went on the trip. We are unpersuaded because the trip to France aligned with Breanne's college spring break, Jonathan was not an employee of Clearcom or Waimana at the time, and throughout the entire trip the visit to the factory lasted only one day. *See Ismail*, T.C. Memo. 2022-113, at *14 (holding that the taxpayer is not entitled to a deduction for airfare when there were "strong personal reasons for traveling" and there was a lack of business purpose); Treas. Reg. § 1.162-2(b)(1).

---

[16] In 2008 Clearcom reported on a separate basis from Waimana.

**[\*29]** Even if we were to assume that the section 162 business purpose requirement is met, the trip costs fail the heightened substantiation standard under section 274. The only documentation provided was the Credit Card statements that list the dates, amounts, occasionally the locations of the charges, and handwritten labels categorizing the expenses to the Subsidiaries. The statements do not provide the business purpose or state what items were purchased at the locations. *See* I.R.C. § 274; *Rogers v. Commissioner*, T.C. Memo. 2018-53, at \*93 (disallowing deduction for travel and meals when the taxpayer "failed to maintain contemporaneous logs or other adequate records that satisfy the section 274(d) requirements"). The 2008 France and Switzerland trip cost of $21,872 is not deductible by Clearcom since it fails to satisfy section 274 and is an economic benefit to the Hees. *See Meridian Wood Prods.*, 725 F.2d at 1191. Therefore, the payments should be classified as a constructive dividend to the Hees.

#### c. *2009 Presidential Inauguration Trip*

Waimana deducted the total cost of the 2009 Presidential Inauguration Trip for Mrs. Hee, Breanne, Jonathan, and Adrianne. Waimana was a sponsor of the Hawaii Society's Inauguration Ball, and the trip allowed Mrs. Hee to meet with Senator Inouye, a then member of the Senate Committee on Appropriations. Although section 162 requirements may be met in this instance, the heightened substantiation requirements under section 274 are not. Waimana provides no documentation regarding receipts or descriptions of the expenses. The only documentation petitioners provide is the Credit Card statements. There are typed labels on the statements categorizing the expenses as Waimana's or the Subsidiaries', but the statements do not report what was purchased at the locations and for what business purposes. *See Jaha*, T.C. Memo. 2025-26, at \*14; *Ward v. Commissioner*, T.C. Memo. 2021-32, at \*10–11.

Accordingly, Waimana cannot deduct the 2009 Presidential Inauguration Trip expense of $2,878 for failure to satisfy the heightened substantiation requirements under section 274.

#### d. *2010 Trip to Tahiti*

Clearcom deducted the entire weeklong trip that Mrs. Hee, Breanne, Adrianne, and Charlton took to Tahiti in 2010. Mr. Hee testified that the purpose of the trip was to see the undersea cable in Tahiti and that the Children came back from the trip and shared their

**[\*30]** observations. Petitioners assert that the trip took a week given that there is only one flight per week from Hawaii to Tahiti. Petitioners' briefs further argued that Mr. Hee "organized a trip so that his family could work together to assess whether expanding to Tahiti would be feasible."

The Hee family spent a day looking for the undersea cable and a day trying to get in contact with Honotua, the company that owned the undersea cable, but the effort was unsuccessful. There were no preparations made before the trip to meet with Honotua representatives to coordinate seeing the undersea cable. Other than possibly two days related to business, the remaining trip was spent on personal activities, including attending Heiva, a dance competition.

"If the trip is primarily personal in nature, the traveling expenses to and from the destination are not deductible even though the taxpayer engages in business activities while at such destination." Treas. Reg. § 1.162-2(b)(1). Determining the primary purpose of a trip requires consideration of all the facts and circumstances, including the ratio of time spent on business to time spent on personal activities. *Crawford v. Commissioner*, T.C. Memo. 2014-156, at \*12; Treas. Reg. § 1.162-2(b)(2). Given that the travelers on the Tahiti trip spent a maximum of two days on business and the remaining time on personal activities, the primary purpose of the trip was not business. This defect provides a basis upon which to disallow these travel deductions. *See* Treas. Reg. § 1.162-2(b).

Petitioners argue that they substantiated the business purpose of the trip by citing a single page document created for the Tahiti trip, which included the dates of travel, the destination, the travelers, and the purpose. The documentation reported the total trip expenses, including a statement that "[i]ndividual charges appear on the credit card statement." However, the individual Credit Card statement charges do not document what was purchased, as many of the purchases on the statement were of groceries, jewelry/watch, and women's accessories. It is not clear that these individual charges have any business purpose since there is no explanation for them, yet they appear personal. *See* I.R.C. § 274.

Moreover, Clearcom paid the trip expenses for the Hee family; therefore, the payment of those expenses would be of personal benefit to the Hees. Thus, the 2010 Tahiti trip cost of $7,280 should be classified as a constructive dividend to the Hees.

**[\*31]**                    e.        *2010 Trip to Walt Disney World*

Breanne, Jonathan, Adrianne, and her friend Amy traveled to Orlando to visit Walt Disney World for a week. Waimana deducted the entire cost. At the time, neither Jonathan nor Amy was an employee of Waimana.

We find that there is no section 162 business purpose to this trip. Mr. Hee testified that the business purpose was to build rapport with Raytheon's chairman by riding a ride sponsored by Raytheon. However, the ride was open to the public and did not require a special invitation. Furthermore, documentation that purportedly substantiated this trip stated the purpose was for Adrianne and Breanne to see "how Federal Infrastructure development funds have been used to benefit society."

The entire trip was spent by Mr. Hee's Children and two other nonemployees enjoying the various parks of Walt Disney World. Petitioners provided no evidence to prove that the attendees met or spoke with anyone from Raytheon while at Walt Disney World, and for the weeklong trip, they rode the ride sponsored by Raytheon once, attended other parks, and stayed in Animal Kingdom Lodge. Petitioners presented no evidence to support the prior claim that the attendees observed how federal infrastructure worked. Accordingly, the Walt Disney World trip cost of $10,919 is not deductible by Waimana and was an economic benefit to the Hees. Therefore, the payments should be classified as a constructive dividend to the Hees.

f.        *2011 Stay at Mauna Lani*

Waimana deducted a trip by Mr. Hee and his entire family to Mauna Lani, which was classified as "Travel" and "Stockholder's Meeting." At the time of the trip Mr. Hee was the only shareholder of Waimana. Mr. Hee testified that the purpose of the trip was succession planning. Adrianne testified that she did not recall any business succession planning meetings in Mauna Lani.

Even if there was a business purpose for the trip, petitioners provided no documentation, such as meeting minutes or agendas, to substantiate the claim that the trip was for succession planning. In fact there was no documentation regarding any of the charges for the trip other than the Credit Card statements, which documented the dates, prices, and general locations of the charges. *See Holden v. Commissioner*, T.C. Memo. 2015-83, at \*41–43. Thus, the lack of documentation regarding the trip supports our conclusion that

[*32] Waimana cannot deduct the 2011 Mauna Lani trip costs. *See* I.R.C. § 274. The Hees also personally benefited from the family trip to Mauna Lani, and the cost of $16,515 should be classified as a constructive dividend.

### 2. *Sport Coat*

Mr. Hee purchased the sport coat in 2009 for a meeting with Raytheon, and he told Ms. Henderson to classify it as an office expense.

The Court has "established three criteria for the cost of clothing to be deductible as an ordinary and necessary business expense: (1) the clothing is required or essential in the taxpayer's employment; (2) the clothing is not suitable for general or personal wear; and (3) the clothing is not so worn." *Barnes v. Commissioner*, T.C. Memo. 2016-79, at *7. Although the sport coat was purchased specifically for the meeting with Raytheon, petitioners have not demonstrated that it was unsuitable for general or personal wear. *See Ayria v. Commissioner*, T.C. Memo. 2022-123, at *9 ("[I]t is well established that the costs of purchasing and maintaining ordinary street attire are not deductible merely because those clothes are worn to the office."). Accordingly, the sport coat purchased for $1,246 is not deductible as a section 162 expense to Waimana. The purchase of the sport coat is a personal benefit to Mr. Hee and should be classified as a constructive dividend to the Hees in 2009.

### 3. *Meals and Entertainment*

Waimana and Sandwich Isles deducted various meal expenses from 2009 to 2012 for Mr. Hee and members of his family. Neither Waimana nor Sandwich Isles recorded meeting agenda, notes, or any documentation regarding the purpose of the meal expenses deducted. The only documentation regarding the purpose of the meals was the classifications on the Credit Card statements under a variety of titles including Abandoned Water Mains, Ownership/Management Training, Public Safety, Telecom, NOC Projects, Advisory Board, Landscaping, Nursery and Abandoned Water Mines, and Stockholder's Meeting. For example, a family meal on July 27, 2009, was classified as "management and ownership training." Mrs. Hee testified that Mr. Hee "would often discuss business. It was never short." Occasional commentary by Mr. Hee regarding business at a family dinner does not classify the dinner as an ordinary and necessary business expense. *See* I.R.C. § 162.

**[\*33]** In addition to the meals' lack of business purpose, there is a lack of substantiation—such as receipts—to satisfy the heightened requirement under section 274. *See Zajac v. Commissioner*, T.C. Memo. 2025-33, at \*17 (disallowing deduction for meals for failing to introduce any documentation to substantiate the expenses under section 274(d)); *Jaha*, T.C. Memo. 2025-26, at \*15–16; *Ismail*, T.C. Memo. 2022-113, at \*15 (holding failure to substantiate the cost of meals disallowed the taxpayer from claiming a deduction). Accordingly, petitioners have not carried their burden of proving the deductibility of the meals from 2009 to 2012, and the food expenses are an economic benefit to the Hees. *See Meridian Wood Prods.*, 725 F.2d at 1191. Therefore, such meals should be classified as constructive dividends. *See supra* Tables pp. 12, 19.

### 4.    *Bookstore*

Waimana deducted payments to the Santa Clara University Bookstore in 2008 as an educational expense. No receipts are provided to substantiate the purpose of the payments. Since there is a lack of evidence to support a business purpose, Waimana is not entitled to deduct the $1,106 charge under section 162, and it was an economic benefit to the Hees. Thus, it should be classified as a constructive dividend to the Hees.

### 5.    *Office Expenses*

Waimana deducted purchases from various locations and classified them as office expenses. These include purchases from a Costco in Santa Clara. The only business purpose in California that petitioners presented was an investment at Siometrix. However, two of Mr. Hee's Children—Breanne and Charlton—lived in California while attending Santa Clara University, and Breanne testified that when Mr. Hee came to visit them in California, he would take her to Costco and pay for groceries.

Other reported office expenses were purchases from clothing stores (e.g., Nordstrom), furniture and supply stores (e.g., Home Depot), and various other department stores (e.g., Target). In 2011 Waimana deducted $73 for airport parking and classified it as an auto expense for Stockholders Meeting.

Mr. Hee classified these charges as office expenses through handwritten or typed notations on the Credit Card statements. Petitioners did not provide receipts or documentation regarding what was purchased at the locations. Many of the charges appear to be for

**[\*34]** purchases that are personal, yet petitioners failed to present evidence that the purchases had an ordinary and necessary business purpose. *See Johnson v. Commissioner*, T.C. Memo. 2025-87, at \*9–10 (holding that the taxpayer failed to substantiate his expenses when "[h]e offered no supporting documentation that might establish the dates, amounts, or business purposes of the expenditures"); *Aulisio v. Commissioner*, T.C. Memo. 2024-29, at \*24–25.

Because of the lack of substantiation, Waimana cannot deduct the charges classified as office expenses under section 162. The charges are for purchases that are personal and render a personal economic benefit to the Hees. Accordingly, the payments should be classified as constructive dividends for 2007 through 2011 to the Hees. *See supra* Tables pp. 12, 19.

E.  *Santa Clara Property*

Petitioners fail to provide evidence, other than self-serving testimony, that the Santa Clara Property was purchased for an ordinary and necessary business purpose. Petitioners argue that the Santa Clara Property served many purposes, including providing a place for Mr. Hee and Waimana employees to stay when checking on Siometrix and for other business, a good investment upon sale, and an opportunity for his Children to learn property management while living in the house.

Petitioners, however, provide no evidence that employees other than Mr. Hee and the Children stayed at the Santa Clara Property. Mr. Hee's Children lived in the house throughout their time at Santa Clara University, which was a five-to-ten-minute walk from the house. The Children never paid rent, but they rented the spare rooms to other tenants and collected rent. These payments collected were not transferred to Waimana, but Breanne used the money to pay maintenance expenses, including items such as toilet paper and paper towels. Further, Waimana's purchase of the Santa Clara Property for Mr. Hee's Children to practice management skills is not an ordinary and necessary business expense for a telecommunications company. Accordingly, we find that there was no ordinary and necessary business purpose for the Santa Clara Property, and it was an economic benefit to the Hee family since the Children lived in the house rent free while attending college.

Respondent's expert, Mr. Walker, testified that the monthly fair market rental value for the Santa Clara Property was $4,900 for 2008

**[\*35]** through 2010, $5,400 for 2011, and $5,800 for 2012. The total unreported amounts were $29,400 for 2008 (as the amount is for the six-month period the house was owned), $58,800 for 2009 and 2010, $25,250 for 2011, and $39,850 for 2012.[17] Mr. Walker's analysis for tax years 2009 through 2012 determines a fair market rental value that exceeded the amounts determined in the Hees' Notice of Deficiency.

Respondent on brief concedes Mr. Walker's analysis for tax year 2008, which determined the fair market rental value of the Santa Clara Property was $600 less than originally determined in the Notice of Deficiency. Respondent on brief does not seek to increase the deficiencies determined for tax years 2009 through 2012 for the Santa Clara Property on the basis of Mr. Walker's analysis. Thus, the fair market rents for the Santa Clara Property established by Mr. Walker of $29,400 for 2008 and the amounts determined in the Notice of Deficiency of $58,600, $57,600, $17,350, and $29,450 for 2009 through 2012 should be classified as constructive dividends to the Hees.[18]

F.    *Cash Withdrawals*

Mr. Hee made multiple cash withdrawals on his Amex Optima card from 2007 to 2012, excluding 2008, that were reimbursed by Waimana. The reimbursement requests did not specify what the cash was used for on the trips or whether Mr. Hee used the entire amount withdrawn. Petitioners provide no additional documentation to substantiate that the cash was used for ordinary and necessary business purchases.

Petitioners argue that since the cash withdrawals were made around the same dates as Mr. Hee's business trips, Waimana should be able to estimate and deduct such expenses under *Cohan*. If we were to accept that the cash was used for travel expenses—such as meals and lodging—the increased substantiation requirements of section 274(d) would apply. The only documentation petitioners provide is the vague bank and Credit Card statements, which would not satisfy the heightened requirements. *See Ward*, T.C. Memo. 2021-32, at *11 (holding that the bank statements alone do not satisfy section 274 as they do not tell the business purpose of each expense or the dates of travel). Therefore, the cash withdrawals, including $8,733, $9,336,

----

[17] For tax years 2011 and 2012 Waimana reported rental income from the Santa Clara House of $39,550 and $29,750.

[18] The expenses for managing the Santa Clara Property are not at issue.

[*36] $5,423, $2,512, and $706 for tax years 2007 through 2012, excluding tax year 2008, are not deductible by Waimana and are a personal economic benefit to the Hees. Accordingly, the payments should be classified as constructive dividends to the Hees. *See Holden*, T.C. Memo. 2015-83, at *41–42 (holding that the taxpayer "failed to show that the payments were for deductible business expenses").

G.      *Shareholder Loans*

Mr. Hee claims that the distributions from Waimana were shareholder loans. We carefully scrutinize this claim and give greater weight to the objective indicators of debt rather than to Mr. Hee's self-serving statements. *See Turner v. Commissioner*, 812 F.2d 650, 654 (11th Cir. 1987), *aff'g* T.C. Memo. 1985-159. The question is whether Mr. Hee and Waimana intended to create a bona fide debtor/creditor relationship at the time of the distributions. *See Estate of Chism v. Commissioner*, 322 F.2d 956, 960 (9th Cir. 1963), *aff'g* T.C. Memo. 1962-6. In determining whether a transaction is a bona fide loan, the courts look to a variety of factors:

> (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan.

*Welch v. Commissioner*, 204 F.3d 1228, 1230 (9th Cir. 2000), *aff'g* T.C. Memo. 1998-121; *see also Commissioner v. Valley Morris Plan*, 305 F.2d 610, 618 (9th Cir. 1962) (defining a loan for federal tax purposes as "an agreement, either expressed or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree" (quoting *Nat'l Bank of Paulding v. Fidelity & Cas. Co.*, 131 F. Supp. 121, 123–24 (S.D. Ohio 1954))), *rev'g in part* 33 T.C. 572 (1959). The factors are nonexclusive, and no single factor is dispositive. *Welch v. Commissioner*, 204 F.3d at 1230. The Court is mindful that formalities may not be followed between shareholders and closely held corporations. *Knutsen-Rowell, Inc. v. Commissioner*, T.C. Memo. 2011-65, 101 T.C.M. (CCH) 1293, 1302. On the basis of these factors we conclude that the

**[\*37]** distributions classified as shareholder loans to Mr. Hee were not bona fide loans.

First, petitioners did not execute formal loan documents with respect to the distributions to Mr. Hee throughout 2005 to 2012. "The absence of a note or other loan documentation is indicative of a constructive dividend." *Teymourian v. Commissioner*, T.C. Memo. 2005-232, 90 T.C.M. (CCH) 352, 355; *see Roschuni v. Commissioner*, 29 T.C. 1193, 1201–02 (1958) (holding that the failure to provide a note or other documentation was a factor in determining there was a constructive dividend and not a shareholder loan), *aff'd per curiam*, 271 F.2d 267 (5th Cir. 1959); *Jones v. Commissioner*, T.C. Memo. 1997-400, 74 T.C.M. (CCH) 473, 480, *aff'd*, 177 F.3d 983 (11th Cir. 1999) (unpublished table decision). Loans without documentation are not uncommon between a shareholder and a closely held corporation. *Miele v. Commissioner*, 56 T.C. 556, 568–69 (1971) ("The fact that [the corporation] loaned money to shareholders without security, notes or interest does not compel an opposite conclusion for such occurrences are not uncommon in dealings between shareholders of a closely held corporation and the corporation."), *aff'd*, 474 F.2d 1338 (3d Cir. 1973) (unpublished table decision).

In failing to create formal loan documents petitioners argue that Mr. Hee always knew he had to repay the distributions and had the intent to repay. Although Waimana is a closely held corporation, Mr. Hee failed to execute any formal loan documents even though Mr. Siu advised him that it was good practice to have a promissory note that showed what was owed, how it was to be repaid, and the interest rate. This factor alone is not determinative, but it weighs in favor of finding that the distributions were constructive dividends.

Second, Waimana did not accrue interest on an annual basis. Waimana did not begin accruing interest on the distributions until after KMH inquired whether Waimana had accrued interest income on the distributions. Waimana's general ledger recorded interest for the first time on December 31, 2012, for $2,800 and again on August 1, 2013, for $68,476. The interest on August 1, 2013, was recorded for years 2004 through 2011. Mr. Hee paid $71,276 of interest in total.

Although no annual interest was accrued on the distributions, Mr. Hee paid interest in 2012 and recorded imputed interest for tax years 2004 through 2011. This factor does weigh in favor of finding that

**[\*38]** the distributions were shareholder loans. *See Teymourian*, 90 T.C.M. (CCH) at 356.

Third, the record is devoid of any evidence that Waimana established a repayment schedule or required any specific repayments. Evidence that a creditor did not intend to enforce repayment or was indifferent to the exact time an advance was repaid indicates that a bona fide loan did not exist. *Gooding Amusement Co. v. Commissioner*, 23 T.C. 408, 418–19 (1954), *aff'd*, 236 F.2d 159 (6th Cir. 1956). Waimana's failure to establish a fixed repayment schedule weighs in favor of finding that the distributions were constructive dividends.

Fourth, Mr. Hee offered no collateral to secure repayment to Waimana. The distributions were treated as unsecured personal loans. This factor indicates the parties did not intend to establish a debtor-creditor relationship at the time the distributions were made.

Fifth, Mr. Hee made two repayments on the distributions.[19] The first repayment was in 2011 for $298,856 when Mr. Hee converted a life insurance policy to cash and contributed it to Waimana. The second payment was on December 31, 2012, when Mr. Hee wrote a check to Waimana for $736,000. As of December 31, 2012, the resulting balance of the Loan to Shareholder account was $25,118.

The second payment came from a dividend payment made to Mr. Hee. On July 31, 2012, Mr. Hee's captive insurance company Ho'opa'a requested that the Hawaii Department of Commerce allow a declared dividend to Waimana for $1 million. The dividend request was granted, and Ho'opa'a paid a $1 million dividend to Waimana in 2012. Waimana then distributed a $1 million cash dividend to Mr. Hee in 2012. Respondent argues that Mr. Hee used the money from Waimana through issuance of a dividend to repay his debt to Waimana. We disagree with respondent since Mr. Hee reported the dividend from Waimana on his Form 1040 for the 2012 tax year. Thus, the repayment of the distribution would be a factor to weigh in favor of finding a shareholder loan. *See Teymourian*, 90 T.C.M. (CCH) at 356.

---

[19] Petitioners mention a third $325,000 repayment for the first time in their Answering Brief. The information was not mentioned at trial or in petitioners' Opening Brief. The charge mentioned is not labeled as a Repayment of Loan to Stockholder the same way the other two payments are labeled on the general ledger. We find that it is unclear whether this truly was a repayment specifically for the distributions.

**[\*39]** Sixth, there is little evidence to show that Mr. Hee had a reasonable prospect of repaying the distributions at the time they were made. A taxpayer's insolvency or financial difficulty casts doubt on the ability to repay and thus on the characterization of a disbursement as a loan. *See Welch v. Commissioner*, 204 F.3d at 1231. We acknowledge that Mr. Hee testified that he always intended to pay off the Loan to Shareholder account. However, we construe Mr. Hee's failure to make annual payments as an indication that he was unable to repay the distributions; if he could have repaid the distributions, it would be reasonable to believe he would have begun making such payments. *See Jones v. Commissioner*, T.C. Memo. 2025-25, at \*49. Waimana had sufficient retained earnings from 2005 to 2012 to advance the amounts recorded on the Loan to Shareholder account to Mr. Hee. However, there is nothing in the record that indicates Mr. Hee had the reasonable prospect of repaying the distributions at the time. Accordingly, this factor is neutral.

Seventh, petitioners produced no evidence showing that Waimana and Mr. Hee conducted themselves in a manner that indicated the distributions were shareholder loans. Mr. Johnston, who was employed by Sandwich Isles, received a $450,000 loan from Sandwich Isles as part of his employment agreement; both Mr. Hee and Mr. Johnston signed the employment agreement, and the loan was secured by a promissory note. These steps were not followed for the distributions to Mr. Hee, who was receiving distributions in much larger amounts. There were no terms that Waimana and Mr. Hee agreed to, nor were there any formalities or steps taken for the distributions other than recording them on the general ledger. Mr. Hee testified that he intended to repay the distributions; although he was the president of Waimana, he took no responsibility to make payments to Waimana. *See id.* Thus, the failure to conduct themselves as if the distributions were loans weighs in favor of finding constructive dividends.

In short, although the parties adhered to certain formalities (i.e., paying interest and making repayments), in the light of the failure to create formal documentation, provide collateral, make a repayment schedule, have a reasonable prospect of repayment, and conduct themselves in a manner that indicates a loan, we cannot say that Mr. Hee and Waimana intended to create a bona fide debtor-creditor relationship. *See Estate of Chism v. Commissioner*, 322 F.2d at 960 (explaining that the existence of a legal obligation to repay is not controlling; rather, the taxpayer's intent to honor, and the corporation's intent to enforce, the obligation is determinative). Accordingly, we

**[\*40]** conclude that the distributions classified as shareholder loans were a personal benefit to the Hees and should be reclassified as constructive dividends from Waimana. *See Jones*, T.C. Memo. 2025-25, at \*50; *Smiley v. Commissioner*, T.C. Memo. 2024-66, at \*34; *Todd v. Commissioner*, T.C. Memo. 2011-123, 101 T.C.M. (CCH) 1603, 1607, *aff'd*, 486 F. App'x 423 (5th Cir. 2012); *Knutsen-Rowell, Inc.*, 101 T.C.M. (CCH) at 1303; *Talmage v. Commissioner*, T.C. Memo. 2008-34, 95 T.C.M. (CCH) 1122, 1140, *aff'd*, 391 F. App'x 660 (9th Cir. 2010).

Thus, we find there are underpayments for the tax years at issue as to the Hees and to Waimana. Further, our analysis above determines the amounts of the deficiencies for the tax years at issue. Accordingly, the remaining issue is whether some parts of the underpayments were attributable to fraud. *See DiLeo v. Commissioner*, 96 T.C. 858, 873 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992).

## IV. *Fraud Penalties*

"If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." I.R.C. § 6663(a). If any portion of the underpayment is attributable to fraud, then the entire underpayment shall be attributable to fraud, except for any portion of the underpayment the taxpayer establishes is not attributable to fraud. I.R.C. § 6663(b). A spouse is not liable for a fraud penalty on a joint return unless some part of the underpayment is due to the fraud of such spouse. I.R.C. § 6663(c). Respondent has not pursued civil fraud penalties against Mrs. Hee, but he has pursued civil fraud penalties against Mr. Hee for tax years 2004 through 2012 and against Waimana for tax years 2003, 2004, and 2006 through 2008.

"[T]he determination of fraud for purposes of the period of limitations on assessment under section 6501(c)(1) is the same as the determination of fraud for purposes of the penalty under section 6663 . . . ." *Neely v. Commissioner*, 116 T.C. 79, 85 (2001). Whether the underpayments at issue were due to fraud determines both whether Mr. Hee and Waimana are liable for civil fraud penalties and whether respondent can assess the deficiencies.[20]

---

[20] Mr. Hee contends that respondent's determination of civil fraud penalties is barred by his right to a jury trial under the Seventh Amendment to the U.S.

**[\*41]** Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." Respondent must show IRS compliance with section 6751(b)(1). *See Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1074 (9th Cir. 2022) ("[Section] 6751(b)(1) requires written supervisory approval before the assessment of the penalty or, if earlier, before the relevant supervisor loses discretion whether to approve the penalty assessment."), *rev'g and remanding* 154 T.C. 68 (2020). The record demonstrates, and petitioners do not dispute, that respondent complied with the requirements of section 6751(b).

V.    *Existence of Fraud*

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *Estate of Pittard v. Commissioner*, 69 T.C. 391, 400 (1977); *Gajewski v. Commissioner*, 67 T.C. 181, 199 (1976), *aff'd*, 578 F.2d 1383 (8th Cir. 1978) (unpublished table decision). The Commissioner bears the burden of proving fraud and must establish fraud by clear and convincing evidence. *See* I.R.C. § 7454(a); Rule 142(b); *Castillo v. Commissioner*, 84 T.C. 405, 408 (1985). If the Commissioner proves that any portion of an underpayment was due to fraud, then "the entire underpayment shall be treated as attributable to fraud" unless the taxpayer shows, by a preponderance of the evidence, that any portion was not so attributable. I.R.C. § 6663(b).

Fraud is not to be imputed or presumed but rather must be established by some independent evidence of fraudulent intent. *Beaver v. Commissioner*, 55 T.C. 85, 92 (1970); *Otsuki v. Commissioner*, 53 T.C. 96, 105 (1969). Fraud may not be found under "circumstances which at the most create only suspicion." *Davis v. Commissioner*, 184 F.2d 86, 87 (10th Cir. 1950). It may be proved by circumstantial evidence and reasonable inferences drawn from the facts since direct proof of the taxpayer's intent is rarely available. *Stephenson v. Commissioner*, 79 T.C. 995, 1006 (1982), *aff'd per curiam*, 748 F.2d 331 (6th Cir. 1984).

Courts have developed a nonexclusive list of factors, so-called badges of fraud, that demonstrate fraudulent intent. *See, e.g.*, *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992). These badges of

---

Constitution. However, this Court has previously ruled to the contrary on the matter. *See Silver Moss Props., LLC v. Commissioner*, 165 T.C. 37 (2025).

**[\*42]** fraud include (1) understating income, (2) keeping inadequate records, (3) giving implausible or inconsistent explanations of behavior, (4) concealing income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) supplying incomplete or misleading information to a tax return preparer, (8) providing testimony that lacks credibility, (9) filing false documents (including false tax returns), (10) failing to file tax returns, and (11) dealing in cash. *Bradford v. Commissioner*, 796 F.2d 303, 307 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601; *see Fumo v. Commissioner*, T.C. Memo. 2025-97, at \*83.

"[A] corporation can act only through its officers and . . . it does not escape responsibility for the acts of its officers performed in that capacity. Corporate fraud necessarily depends upon the fraudulent intent of the corporate officer." *Federbush v. Commissioner*, 34 T.C. 740, 749 (1960), *aff'd per curiam*, 325 F.2d 1 (2d Cir. 1963); *see Benes v. Commissioner*, 42 T.C. 358, 382 (1964) ("Where fraud is alleged against a corporate taxpayer, the requisite proof of fraudulent intent is to be found in the acts of its officers, inasmuch as the corporation, being an artificial person created by law, can have no separate intent of its own apart from those who direct its affairs."), *aff'd*, 355 F.2d 929 (6th Cir. 1966), *abrogated by*, *Truesdell*, 89 T.C. 1280.

The existence of any one badge is not dispositive, but the existence of several badges may be persuasive circumstantial evidence of fraud. *Niedringhaus*, 99 T.C. at 211. On brief respondent has raised a number of badges of fraud against Mr. Hee and Waimana, which we address below, with the remaining factors having no application.[21]

A.     *Understating Income*

A pattern of substantially underreporting income over several successive years can be strong evidence of fraudulent intent. *See Vanover v. Commissioner*, T.C. Memo. 2012-79, 103 T.C.M. (CCH) 1418, 1421; *Zhadanov v. Commissioner*, T.C. Memo. 2002-104, 83 T.C.M. (CCH) 1553, 1560. Such a pattern is evidence of fraudulent intent "even where the record is 'devoid of the usual indicia of fraud.'" *Isaacson v. Commissioner*, T.C. Memo. 2020-17, at \*48–49 (quoting *Otsuki*, 53 T.C. at 107–08), *aff'd*, No. 20-71121, 2022 WL 541617 (9th Cir. Feb. 23, 2022). We have said that consistent failure to report substantial income over

---

[21] Several of these factors have no application here, including concealing income or assets, engaging in illegal activities, or failing to cooperate with tax authorities. *See Fumo*, T.C. Memo. 2025-97, at \*83.

[*43] several years is highly persuasive evidence of fraudulent intent. *See Temple v. Commissioner*, T.C. Memo. 2000-337, *aff'd*, 62 F. App'x 605 (6th Cir. 2003). Consistent and substantial understatement of income is "strong evidence of fraud." *Korecky v. Commissioner*, 781 F.2d 1566, 1568 (11th Cir. 1986) (quoting *Merritt v. Commissioner*, 301 F.2d 484, 487 (5th Cir. 1962), *aff'g* T.C. Memo. 1959-172), *aff'g per curiam* T.C. Memo. 1985-63.[22]

We have previously held that Mr. Hee and Waimana are precluded from disputing that Mr. Hee underpaid tax for tax years 2007 through 2012. Further, we have determined that Mr. Hee has understated his income from constructive dividends received from Waimana by over $2 million in the aggregate during tax years 2004 through 2012. The unreported income stems from disallowed deductions of personal expenses that Waimana paid on behalf of Mr. Hee and his family. The volume of unreported income for each year was large relative to the income that Mr. Hee actually reported, which ranged from $150,009 to $606,250.

Waimana argues that it is separate from Mr. Hee and that it was never charged with or convicted of filing any false income tax returns or any other criminal charges. Mr. Hee did have separate personal filings. But we also find that Waimana underpaid tax by improperly claiming personal expenses for Mr. Hee and his family as business expense deductions, which reduced its taxable income and the amount of tax due for tax years 2003, 2004, and 2006 through 2008. However, for two of the five years, 2006 and 2008, the deficiencies are only $7,328 and $2,062, respectively.

Mr. Hee's pattern and substantial amount of underreporting are persuasive evidence of fraudulent intent. *See Musa v. Commissioner*, T.C. Memo. 2015-58, at *27, *aff'd*, 854 F.3d 934 (7th Cir. 2017). However, as to Waimana we acknowledge that there is less of a clear pattern of substantially underreporting income over several successive years. After considering all the above, we determine this badge is less favorable to respondent than he contends; but we acknowledge (at a minimum)

_____

[22] Some of the deductions being challenged by respondent were not paid or deducted by Waimana. Rather, they were deducted by the Subsidiaries. For instance, respondent contends that the 2008 Switzerland trip is evidence of fraud on the part of the Waimana; however, their own evidence (i.e., Exhibit 421-J) reflects that this expense was deducted by Clearcom. These discrepancies will need to be resolved under Rule 155.

**[\*44]** that this factor is somewhat favorable to respondent as evidence of fraudulent intent on the part of Waimana.

### B.  *Maintaining Adequate Records*

Taxpayers must maintain records sufficient for the Commissioner to determine their tax liability. I.R.C. § 6001. Failing "to keep or produce adequate records to support . . . tax return positions" is an indicator of fraud. *Scott v. Commissioner*, T.C. Memo. 2012-65, 103 T.C.M. (CCH) 1310, 1317. Petitioners argue that the failure to document the shareholder loans is not adequate to support this badge of fraud. Respondent contends that petitioners consistently failed to maintain adequate records as follows: (1) Waimana did not accurately record the Children's hours worked for many of the tax years at issue; (2) Waimana failed to substantiate the airfare expenses for the Children's flights; (3) Waimana did not substantiate with receipts or documentation any of the expenses reimbursed for the trips in question; (4) Mr. Hee did not provide receipts for the meals reimbursed; (5) Mr. Hee failed to provide receipts for any purchases made with the cash he withdrew; (6) Mr. Hee failed to provide receipts or a business purpose for the office expenses; and (7) Waimana did not document the shareholder loans with any formal loan documentation.

As to Mr. Hee we find respondent's assertions to be compelling since Mr. Hee failed to furnish receipts (aside from Credit Card statements) reflecting his Children's airfare, trips, meal reimbursements, or office expenses.

Mr. Hee would categorize travel charges on his Credit Cards by written notations on the statements, but the notations would not indicate the purpose or reason for the charges' being expensed, nor would receipts be furnished. For instance, Mr. Hee created a document for substantiating the Walt Disney World trip by detailing the dates traveled and the destination; however, no receipts for the trip were furnished. Moreover, the trip did not accurately document the travelers as it listed only Adrianne and Breanne, excluding the additional friends Amy and Jonathan.

Waimana presented records and evidence rebutting respondent's claim and reflecting a reimbursement process which did include detailed receipts. Waimana was subject to annual financial audits, and employees at Waimana testified that all information requested by Chinaka & Siu was furnished—the same was confirmed through prior

[*45] testimony of Mr. Chinaka offered at Mr. Hee's criminal trial. However, Mr. Hee, as a corporate officer, processed and approved his own claims outside of Waimana's process. Waimana failed not only to maintain records for Mr. Hee's personal expenses but also to maintain adequate records as to the Children's or Mrs. Hee's hours worked for Waimana.

Thus, the failure to keep adequate records and the inaccuracy of the records that were kept for trips supports fraudulent intent as to Mr. Hee. Moreover, Waimana had a system in place to record expenses, but it did not follow the process for Mr. Hee and his family. Accordingly, we find this factor supports a finding of fraudulent intent.

C.    *Giving Implausible or Inconsistent Explanations*

"We may consider a taxpayer's filings and testimony as evidence of implausible or inconsistent explanations." *Di Giorgio v. Commissioner*, T.C. Memo. 2023-44, at *25. Petitioners argue that any inconsistencies are due to the passage of time since such activities occurred in 2003 through 2012 and are not evidence of fraudulent intent. Although there has been a passage of time regarding the activities in issue and minor inconsistences may have resulted, we find that Mr. Hee offered the Court several significant implausible and inconsistent explanations about Waimana's business expenses that are not due solely to the passage of time.

Mr. Hee testified that the purpose of the trip to Walt Disney World was to establish rapport with the chairman of Raytheon. However, documentation that substantiated this trip stated that the purpose was for Adrianne and Breanne to see "how Federal Infrastructure development funds have been used to benefit society." Not only has the stated purpose been inconsistent, but it is implausible that the purpose was either of these, given that the attendees rode on the ride sponsored by Raytheon once and there was no testimony that there was any discussion regarding federal infrastructure development.

We find that the testimony as to the purpose of the Tahiti trip was also implausible. Mr. Hee testified that the purpose of sending his family to Tahiti for a week was to conduct a site investigation of an undersea communications cable system. Even if we were to consider these self-serving statements to be true, we find it implausible that the trip was for a business purpose when evidence and testimony from his family indicate they spent no more than two days related to business

[*46] and absolutely no preparations were made before the trip to actually conduct business activities. Further, testimony indicates that the remaining time was spent on personal activities including attending Heiva, a dance competition, and individual Credit Card charges list purchases such as jewelry/watch and women's accessories.

Next, there are inconsistent and implausible explanations as to the purpose of the Santa Clara Property. Mr. Hee testified that the purpose of the house was to provide both a place to stay when visiting Siometrix to check on his investment and a good learning opportunity for Charlton and Breanne. However, Ms. Tamanaha testified that Waimana (without clarifying which employee) told her that the Santa Clara house "was to be used by the employees when they went up to California as a working environment." They did not tell her which employees were using the residence, and she was not aware that the Children were living at the property. Not only was there inconsistent testimony given as to the purpose of the Santa Clara Property, but it is implausible that it was truly used for any of the asserted business reasons. Both Charlton and Breanne lived in the house while attending Santa Clara University, and they rented the remaining rooms out to other tenants. The purpose of the Santa Clara home is rather apparent: It was the residence of Mr. Hee's Children while they attended college.

Mr. Hee's statements as the sole shareholder and president of Waimana during the tax years at issue are inextricably bound up with his statements as an individual, private taxpayer. *See Benes*, 42 T.C. at 384. In sum we find that Mr. Hee's explanations were inconsistent and implausible and are persuasive evidence of fraudulent intent as to both Mr. Hee and Waimana. *See Fumo*, T.C. Memo. 2025-97, at *84; *Beleiu v. Commissioner*, T.C. Memo. 2025-70, at *10; *Podlucky v. Commissioner*, T.C. Memo. 2022-45, at *21, *aff'd*, No. 22-70169, 2024 WL 4234510 (9th Cir. Sep. 19, 2024).

D.    *Supplying Incomplete or Misleading Information to a Tax Return Preparer*

A taxpayer's failure to provide her tax return preparer complete and accurate records may reflect the taxpayer's intent to conceal and deceive. *See Dubose v. Commissioner*, T.C. Memo. 1996-99, 71 T.C.M. (CCH) 2299, 2301; *Scallen v. Commissioner*, T.C. Memo. 1987-412, 54 T.C.M. (CCH) 177, 208, *aff'd*, 877 F.2d 1364 (8th Cir. 1989). Petitioners argue that there is no evidence that Mr. Hee and Waimana deceived Waimana's internal CPAs or tax preparers as both Chinaka & Siu and

[*47] KMH had all essential records at their disposal. Petitioners further argue that if there was an irregularity the accountants would contact Ms. Henderson and straighten it out.

First, we note that Chinaka & Siu conducted audits of Waimana, rendering favorable audit findings. Chinaka & Siu was responsible for certified audits of the financial statements of Waimana for tax years 2005 through 2007, and Chinaka & Siu prepared the general ledger for Waimana for tax year 2004. We also heard from Waimana's employees, including those within the internal accounting department, confirming that they always complied with any requests from outside accountants. Likewise, Mr. Chinaka testified at Mr. Hee's criminal trial that employees of Waimana were always cooperative and forthcoming with requests for information.

However, we find that Mr. Hee, as an officer of Waimana, provided inaccurate, incomplete, and misleading information to the accountants, Chinaka & Siu and KMH. First, Mr. Hee circumvented the reimbursement policies regarding reporting his personal expenses. Specifically, the trips taken by Mr. Hee and his family were not reviewed by Ms. Costa through Waimana's ordinary process of reporting travel. Thus, the books that were provided to Chinaka & Siu and KMH were misleading and incomplete. Next, Chinaka & Siu did not know when preparing Waimana's tax returns that Waimana was paying for the services of a massage therapist. Mr. Hee did not communicate this to his accountants. Ms. Tamanaha testified that no one working at Waimana communicated Ms. Doll's occupation to her while she worked on the Waimana returns, and when she was preparing the tax returns, she believed Ms. Doll was a consultant. Chinaka & Siu first learned that Ms. Doll was a masseuse during the IRS examination in 2011.

KMH struggled to gather enough information in time from Waimana for the 2009 and 2010 tax returns. KMH did not know about the Children's receiving salaries from Waimana in 2010 and 2011 when preparing the 2009 and 2010 tax returns. KMH learned about the Children's receiving salaries in 2012. Nor did Waimana and Mr. Hee disclose that the Santa Clara Property was being rented, and KMH was not made aware until 2012 when it was preparing the 2011 tax return. Further, Mr. Hee directed Ms. Henderson to reclassify personal expenses as business expenses on Waimana's books, which were provided to the KMH accountants to rely upon. For example, the charges regarding the Walt Disney World trip were classified as personal, but Mr. Hee had the charges reclassified as business.

**[\*48]** In 2012 KMH sent a Prepared by Client request to Sang Son Sumida—an accountant working for Waimana or one of its Subsidiaries—which stated: "Are personal expenses of shareholders/employees included as business expenses on the financials? If yes, attach a detailed schedule, including account numbers." KMH employees followed up on this request multiple times before Mr. Sumida from Waimana responded by stating: "To our [Waimana's] best knowledge, personal expenses of shareholders/employees were not included as business expenses on the financials." Petitioners argue that KMH was aware of the IRS's concerns regarding personal expenses when preparing the consolidated returns for tax years 2009 through 2012. Deanna Awa from KMH testified she was aware of the concern; but when KMH requested information from Waimana on the subject, she expected that the client would answer truthfully.

In sum, Mr. Hee supplied false, incomplete, and misleading information to Chinaka & Siu and to KMH. Thus, such information furnished is persuasive evidence of fraudulent intent, and we determine this badge is evidence of fraudulent intent as to both Mr. Hee and Waimana.

E.     *Lack of Credibility of Taxpayer's Testimony*

Overall, we find that portions of Mr. Hee's testimony at trial were not credible. For example, petitioners argue that Mr. Hee relied on his CPAs to make tax decisions, and he may have also been confused or misunderstood tax law. However, it was Mr. Hee, as president of Waimana and its Subsidiaries, who would commonly approve employee trips and expenses as business related since he reviewed these requests and approved reimbursements. Mr. Hee confirmed that he knew how to distinguish between personal and business charges, and he would instruct Ms. Henderson how to categorize items on the statement before issuing him a check. Likewise, Mr. Hee's inconsistent statements as to the purpose of trips and whether they were personal reflect his lack of credibility.

Respondent equally relies on Mr. Hee's criminal conviction and Judge Mollway's determination: "I do think [Mr. Hee] gave testimony when he was on the stand that was false, that was material, and that was willful . . . ." Although Judge Mollway found that Mr. Hee's testimony lacked credibility, that determination alone is not sufficient for respondent to independently establish fraud. *See* I.R.C. § 7454(a);

[*49] *McGowan v. Commissioner*, T.C. Memo. 2004-146, 87 T.C.M. (CCH) 1421, 1422 ("[The Commissioner] cannot rely on [the taxpayer's] conviction to sustain his burden of establishing fraud but must clearly and convincingly prove that [the taxpayer] intended to evade tax."), *aff'd*, 187 F. App'x 915 (11th Cir. 2006).

In sum, we determine that Mr. Hee's failure to provide credible testimony at trial and in previous proceedings supports the finding of fraud as to Mr. Hee and to Waimana.

F.      *Filing False Documents*

Before trial we ruled that Mr. Hee is precluded from disputing that he filed false tax returns for tax years 2007 through 2012. *See* Order (Nov. 27, 2024). Thus, Mr. Hee's pattern of filing false tax returns weighs in favor of finding fraud. *See Podlucky*, T.C. Memo. 2022-45, at *22.

Waimana contends that respondent has failed to identify "one major document that was false" and that "simply no proof was offered" showing fraudulent intent through the filing of false documents by Waimana as to all tax years in question.

"Filing false documents includes filing false income tax returns." *Musa*, T.C. Memo. 2015-58, at *38; *see Isaacson*, T.C. Memo. 2020-17, at *54 ("Filing false documents with the Internal Revenue Service or with third parties supports an inference of fraudulent intent."). However, "[a] taxpayer's filing an income tax return that omits income constitutes filing a false document. But such a filing alone is not sufficient to satisfy this badge." *Hoyal v. Commissioner*, T.C. Memo. 2024-84, at *23 (some citations omitted) (citing *Norris v. Commissioner*, T.C. Memo. 2011-161, 102 T.C.M. (CCH) 26, 31).

We recognize that Waimana did file tax returns for tax years 2003, 2004, and 2006 through 2008 and underreported material amounts of its taxable income on its tax returns by improperly claiming Mr. Hee's personal expenses as business expense deductions for the tax years at issue. However, improperly claiming business expense deductions on tax returns without providing any additional false documentation without intent is not sufficient for us to conclude that

**[\*50]** Waimana filed the returns for the purpose of evading income tax.[23] *See Norris*, 102 T.C.M. at 31; *see also Hoyal*, T.C. Memo. 2024-84, at \*23 ("Even if we assumed that they understated income on their tax returns for the years in issue, that alone is not sufficient to conclude that they filed the returns with the intent to evade income tax."). Respondent, however, makes the compelling rebuttal that through the actions of Mr. Hee, as sole shareholder and president, Waimana knowingly understated its corporate income.

We heard significant testimony as to how the corporate returns were prepared in the ordinary course of business, which included relying upon financial data either prepared by or furnished from Waimana and involved several different accountants and CPAs over the years. Regarding the preparation of Waimana's tax returns, the Court also heard from accountants from Chinaka & Siu and KMH.

Chinaka & Siu was engaged to prepare both financial audits and tax returns. They received copies of Mr. Hee's personal Credit Card statements and thus were intimately involved in the tax reporting process. In *Allen v. Commissioner*, 128 T.C. 37, 42 (2007), we held that the filing of a fraudulent return extended indefinitely the period during which the IRS could assess additional tax, even though the taxpayer's preparer alone had acted with fraudulent intent, while the taxpayer had not. *See also Murrin v. Commissioner*, T.C. Memo. 2024-10. Here, however, respondent has presented no evidence reflecting alleged fraud by Waimana's tax preparers either alone or in concert with Mr. Hee. *See Allen*, 128 T.C. at 42.

After considering all of the above, we determine this badge is less favorable than respondent contends; however, we acknowledge (at a minimum) that this factor is somewhat favorable to respondent as evidence of fraudulent intent on the part of Waimana.

G.     *Failing to File Tax Returns*

"While such failure to file, standing alone, does not establish fraud, it is persuasive circumstantial evidence of fraud." *Fedechko v. Commissioner*, T.C. Memo. 1990-390, 60 T.C.M. (CCH) 272, 276; *see United States v. Magnus*, 365 F.2d 1007, 1011–12 (2d Cir. 1966). We do recognize that Waimana did file tax returns for tax years 2003, 2004,

---

[23] We decline to take into consideration the Federal Communications Commissioner Forfeiture Order against Sandwich Isles, Waimana, and Mr. Hee for this analysis.

[*51] and 2006 through 2008; however, Waimana did not timely file for tax years 2003 and 2007.

Waimana requested an extension for tax year 2003 on October 15, 2004, but the return was not filed until April 23, 2007. Petitioners argue that the entire two-year delay was due to the death of Waimana's accountant's mother. Although that situation could account for a delay of a few months, Waimana cannot cast blame on its accountant when it did not otherwise take any steps to ensure the timely filing of its return. *See Metra Chem Corp. v. Commissioner*, 88 T.C. 654, 662 (1987) ("As a general rule, the duty of filing accurate returns cannot be avoided by placing responsibility on a tax return preparer."). The Form 1120 for tax year 2007 was also untimely filed, on May 12, 2009; however, on the basis of the testimony received, some of the delay is attributable to Waimana's newly retained CPA firm. We have said the failure to file timely returns for four tax years is circumstantial evidence of fraudulent intent. *See Fedechko*, 60 T.C.M. (CCH) at 276 (holding that the taxpayer's "fail[ure] to file timely their returns for the years in issue" was circumstantial evidence of fraud). After considering the evidence before us, we find that Waimana's two failures appear to be isolated, nonconsecutive, and not entirely due to its delay. There is no evidence that Waimana was late with its tax filings for tax years 2004, 2006, and 2008. We therefore determine that this badge, as to Waimana, does not weigh in favor of finding of fraudulent intent.

We do acknowledge, however, that Mr. Hee did timely file tax returns for tax years 2004 through 2012. Thus, this factor does not weigh in favor of finding fraudulent intent as to Mr. Hee.

H.    *Dealing in Cash*

Extensive dealing in cash to avoid scrutiny of a taxpayer's finances is evidence of fraud. *See Bradford v. Commissioner*, 796 F.2d at 308. Fraudulent intent may be inferred when a taxpayer handles her affairs in a manner designed "to avoid making the records usual in transactions of the kind." *Spies v. United States*, 317 U.S. 492, 499 (1943); *see Valbrun v. Commissioner*, T.C. Memo. 2004-242, 88 T.C.M. (CCH) 385, 387.

Mr. Hee did not receive extensive reimbursement for cash withdrawals from Waimana. The annual amounts are relatively low. Petitioners mentioned in their briefs that many of the withdrawals occurred during business trips for Waimana, and Mr. Hee could not

**[\*52]** recall the reasons for the cash withdrawals. Respondent did not provide sufficient evidence that Mr. Hee dealt primarily in cash to avoid making records or hide his cash dealings. *See Chernomordikov v. Commissioner*, T.C. Memo. 2025-129, at \*20.

As to Waimana respondent has made no allegation nor has he presented evidence that the company was dealing in cash. Thus, this factor does not weigh in favor of finding fraudulent intent as to Mr. Hee or to Waimana.

I.     *Intelligence and Sophistication*

Respondent asserts that Mr. Hee's sophistication is a factor in indicating fraud. Petitioners argue that respondent has made no attempt to show that Mr. Hee's purported business sophistication has any relationship to an alleged intent to defraud the IRS from 2003 through 2012.

The sophistication, education, and intelligence of the taxpayer are relevant to determining fraudulent intent. *See Niedringhaus*, 99 T.C. at 211; *Stephenson*, 79 T.C. at 1006; *Iley v. Commissioner*, 19 T.C. 631, 635 (1952); *Beleiu*, T.C. Memo. 2025-70, at \*8; *Clark v. Commissioner*, T.C. Memo. 2021-114, at \*37. A taxpayer's education and sophistication are not themselves badges of fraud but are relevant factors in determining "whether a taxpayer could have formed the intent necessary to be found liable for the fraud penalty." *Holmes v. Commissioner*, T.C. Memo. 2012-251, at \*31 n.16 (quoting *Wickersham v. Commissioner*, T.C. Memo. 1999-276, 78 T.C.M. (CCH) 315, 319), *aff'd*, 593 F. App'x 693 (9th Cir. 2015).

Mr. Hee was a sophisticated businessman. He is a graduate of the U.S. Naval Academy, ran a successful telecommunications company, had employees, and dealt with federal regulations. *See Di Giorgio*, T.C. Memo. 2023-44, at \*24. His testimony provides evidence that he had an above-average understanding of accounting and tax knowledge as he knew how to distinguish between personal and business expenses and would tell Ms. Henderson how to categorize items on Credit Card statements. Mr. Hee's sophistication is not dispositive of fraudulent intent but is a relevant factor in determining his and Waimana's fraud.

J.     *Summary as to Fraud*

Considering the record in toto, some six factors support the finding of fraud as to Mr. Hee: understating income; maintaining

[*53] inadequate records; giving implausible or inconsistent explanations; supplying incomplete or misleading information to a tax return preparer; lack of credibility of the taxpayer's testimony; and filing false documents. Only two factors, failing to file tax returns and dealing in cash, do not weigh in favor of finding fraud as to Mr. Hee. Accordingly, we hold that respondent has established by clear and convincing evidence that the underpayments of tax for years 2004 through 2012 are attributable to fraud as to Mr. Hee, and Mr. Hee has not established, by a preponderance of the evidence, that any portions of the underpayments for these same years were not attributable to fraud. *See* I.R.C. § 6663(b).

Respondent's case for civil fraud against Waimana principally relates to how Mr. Hee's sophistication and actions as a corporate officer are attributed to Waimana. "[A] corporation can act only through its officers and . . . it does not escape responsibility for the acts of its officers performed in that capacity. Corporate fraud necessarily depends upon the fraudulent intent of the corporate officer." *Federbush*, 34 T.C. at 749. When the badges of fraud are examined as to Waimana, several factors support the finding of fraud: maintaining inadequate records, giving implausible or inconsistent explanations, and supplying incomplete or misleading information to a tax return preparer, as well as Mr. Hee's lack of credible testimony. Two additional factors, understating income and filing false documents, are somewhat favorable to respondent. Inversely, there are only two factors that do not weigh in favor of finding fraud: failing to file tax returns and dealing in cash. After considering these badges of fraud in toto, along with Mr. Hee's intelligence and sophistication, we determine that respondent's case for fraud as to Waimana is equally clear and convincing. *See* I.R.C. § 6663(b). Thus, we will sustain respondent's determinations that Mr. Hee is liable for civil fraud penalties for tax years 2004 through 2012 and Waimana is liable for civil fraud penalties for tax years 2003, 2004, and 2006 through 2008.

VI.    *Conclusion*

We conclude that respondent has established by clear and convincing evidence that the underpayments of tax for years 2004 through 2012 as to Mr. Hee were attributable to fraud; therefore, tax years 2004 through 2012 remain open. *See* I.R.C. § 6501(c)(1). Accordingly, respondent is not barred from assessing deficiencies for the Hees' tax years 2004 through 2012 and civil fraud penalties against Mr. Hee. Therefore, we will sustain respondent's determined deficiencies for

**[\*54]** the reasons stated *supra* Part III for tax years 2004 through 2012 in Docket No. 24068-22.

We equally conclude that respondent has established that Waimana's underpayments for tax years 2003, 2004, and 2006 through 2008 were attributable to fraud; therefore, tax years 2003, 2004, 2006, 2007, and 2008 remain open. *See* I.R.C. § 6501(c)(1). Accordingly, we will sustain respondent's determined deficiencies consistent with this Opinion as well as the section 6663 civil fraud penalties for tax years 2003, 2004, and 2006 through 2008, the addition to tax under section 6651(a)(1) for tax year 2003, and the disallowed NOLs attributable to Waimana's disallowed business deductions incurred in tax years 2005 and 2006 in Docket No. 24077-22.[24]

In reaching our decisions we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant, moot, or without merit.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[24] In briefing Waimana did not challenge respondent's NOL adjustments or does not raise a defense to the addition to tax; we accordingly deem the issues to be conceded. *See, e.g.*, *Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned.").